Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/22/2021 09:09 AM CST

Robert Dick, appellee and cross-appellant, v.
Koski Professional Group, P.C., third-party
plaintiff, appellant and cross-appellee, and
Bland & Associates, P.C., third-party
defendant, appellee and
cross-appellant.

___ N.W.2d ___

Filed October 30, 2020.    No. S-19-132.

1. **Judgments: Jury Trials: Pretrial Procedure: Appeal and Error.** The allocation of peremptory challenges in a multi-party civil suit is left to the discretion of the trial court and will be reviewed for an abuse of discretion.

2. **Judgments: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

3. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.

4. **Jury Instructions: Pleadings: Appeal and Error.** A party may not complain of the failure of the trial court to instruct on issues that are outside the scope of the pleadings.

5. **Jury Instructions.** Jury instructions must be read together; they must be read conjunctively, rather than separately in isolation.

6. **Jury Instructions: Appeal and Error.** If the jury instructions given, which are taken as a whole, correctly state the law, are not misleading,

and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.

7. **Directed Verdict: Appeal and Error.** When a motion for directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and where the issues should be decided as a matter of law.

8. **Pleadings: Appeal and Error.** Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.

9. **Juries.** In Nebraska, the number of peremptory challenges allowable in civil actions is governed by case law and unwritten rules of court.

10. **Juries: Parties.** A party can exercise the peremptory challenge to remove a potential juror on the basis of that party's belief that the juror's status as a member of some cognizable group will prejudice his or her attitude toward that party's case.

11. ____: ____. Where there are multiple parties on the same side of a lawsuit, each side of the lawsuit is entitled to a total of three peremptory challenges, unless the multiple parties' interests are adverse to each other.

12. ____: ____. Multiple parties on the same side of a civil lawsuit are adverse to each other when a good-faith controversy exists between them over an issue of fact that the jury will decide.

13. **Parties.** The fact that one party may have to defend against a theory of recovery not asserted against the other does not in itself mean that the two parties' interests are adverse.

14. ____. Relevant circumstances to determine whether the defendants' interests are adverse to each other include but are not limited to (1) whether separate acts of misconduct were alleged against the separate defendants, (2) whether comparative negligence principles applied to the case, (3) the type of relationship among the defendants, (4) whether cross-claims or third-party complaints had been filed and the positions taken therein, (5) information disclosed on pretrial discovery, and (6) representations made by the parties.

15. **Juries: Parties: Appeal and Error.** One who does not exercise all his or her peremptory challenges cannot assign as error the court's refusal to allow a greater number or a lesser number to the opposing parties.

16. **Contracts: Shareholder Agreements.** Shareholder agreements are construed according to the principles of the law of contracts.

17. **Actions: Breach of Contract: Damages.** A suit for damages arising from breach of a contract presents an action at law.

18. **Contracts: Shareholder Agreements.** The meaning of an unambiguous shareholder agreement, like any contract, is a question of law.

19. **Contracts.** Matters seeking avoidance of a valid contract are affirmative defenses.

20. **Contracts: Words and Phrases.** A condition precedent is a condition that must be performed before the parties' agreement becomes a binding contract or a condition which must be fulfilled before a duty to perform an existing contract arises.

21. **Contracts: Breach of Contract: Damages.** A condition precedent is in contrast to a promise in a contract, the nonfulfillment of which is a breach, i.e., the failure to perform that which was required by a legal duty, and the remedy lies in an action for damages.

22. **Contracts: Intent: Words and Phrases.** Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract.

23. ____: ____: ____. Where contracting parties' intent is not clear, the language is generally interpreted as promissory rather than conditional.

24. **Contracts: Liability: Tender.** In a simultaneous exchange, entailing mutual conditions precedent, liability under the contract by the first party is triggered by an offer of tender by the second party, which is conditional upon contemporaneous performance of the first.

25. **Contracts: Words and Phrases.** Tender is an offer to perform a condition or obligation, coupled with the present ability of immediate performance, so that, were it not for the refusal of cooperation by the party to whom tendered, the condition or obligation would be immediately satisfied.

26. **Tender: Waiver.** Tender before suit is filed is waived where the party entitled to payment, by conduct or declaration, proclaims that if a tender should be made, acceptance would be refused.

27. **Contracts: Tender: Proof.** Acts which, in themselves, are insufficient to make a complete tender may constitute proof of readiness to perform, so as to protect the rights of a party under a contract, where a proper tender is rendered impossible by circumstances not due to the fault of the tenderer.

28. **Actions: Contracts: Pleadings.** To constitute a defense to an action based on contract, the matters must generally be germane to the cause of action pleaded, in addition to presenting a legal reason why plaintiff will not recover.

29. **Claims: Contracts: Torts.** A claim of defense arising out of tort concepts is not generally available where the claim of the plaintiff is premised upon contract.

30. **Contracts.** Fiduciary duties arise from the relationship and not from the terms of the agreement.

31. **Contracts: Parties.** The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract.

32. **Contracts.** The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.

33. \_\_\_\_. The covenant of good faith and fair dealing cannot give rise to new obligations not otherwise contained in a contract's express terms.

34. **Contracts: Breach of Contract.** The "prior material breach" doctrine applies when a contract contemplates an exchange of performances between the parties, and the doctrine holds that one party's failure to perform allows the other party to cease its own performance.

35. \_\_\_\_: \_\_\_\_. A duty under a separate contract is not affected by the doctrine of prior material breach, nor is a duty under the same contract affected if it was not one to render a performance to be exchanged under an exchange of promises; further, only duties to render performance are affected.

36. **Actions: Breach of Contract.** A prior material breach by the other contracting party is an affirmative defense that applies only when the breaching party breaches the same contract on which he or she is suing.

37. **Shareholder Agreements: Corporations.** Shareholder agreements may be freestanding of corporate bylaws.

38. **Claims: Juries: Verdicts.** Factual issues necessarily determined by a jury's verdict on one claim in a case are also deemed resolved with respect to other claims in the same case.

39. **Judgments.** The existence of a fiduciary duty and scope of that duty are questions of law for the court to decide.

40. **Corporations: Trusts.** The law of trusts forms the basis for fiduciary duties. Fiduciaries in a corporation are not trustees in the strict sense because they do not have title to the estate; they are instead fiduciaries to the extent that they control the corporation's property.

41. **Equity: Courts.** The scope of fiduciary duties is flexible, reflecting the historical approach of the courts of equity.

42. **Corporations.** Minority shareholders do not owe a fiduciary duty to each other or to the corporation.

43. \_\_\_\_. An officer of a corporation occupies a fiduciary relationship toward the corporation and its stockholders.

44. \_\_\_\_. The existence of a fiduciary duty of an officer in a closely held corporation depends on the ability to exercise the status that creates it, and nominal corporate officers with no management authority generally do not owe fiduciary duties to the corporation.

45. **Actions: Damages: Proof.** The plaintiff in an action for breach of fiduciary duty has the burden to prove that (1) the defendant owed the

plaintiff a fiduciary duty, (2) the defendant breached the duty, (3) the defendant's breach was the cause of the injury to the plaintiff, and (4) the plaintiff was damaged.

46. **Actions: Corporations: Proof.** In an action for breach of fiduciary duty toward a corporation, the plaintiff must establish a prima facie case of both the existence of a fiduciary duty and its breach before the burden shifts to the defendant to prove the defendant acted in an open, fair, and honest manner such that no breach of fiduciary duty occurred.

47. **Corporations: Proof.** Negotiating to leave one's fiduciary position with a closely held corporation and to enter into competing employment elsewhere is not a transaction that shifts the burden to the fiduciary to prove the negotiation's fairness.

48. **Employer and Employee.** An employer's right to demand and receive loyalty must be tempered by society's legitimate interest in encouraging competition.

49. **Employer and Employee: Trade Secrets.** An employee who plans to compete with his or her employer may not (1) appropriate the employer's trade secrets, (2) solicit the employer's customers while still working for the employer, (3) solicit the departure of other employees while still working for the employer, or (4) carry away confidential information, such as customer lists.

50. **Trial: Evidence: Appeal and Error.** Error may not be predicated upon a ruling of a trial court excluding testimony of a witness unless the substance of the evidence to be offered by the testimony was made known to the trial judge by offer or was apparent from the context within which the questions were asked.

51. **Corporations: Contracts.** Customers without exclusive contractual arrangements with corporations or with whom a corporation has to annually renew contracts are not corporate business opportunities.

52. **Equity: Unjust Enrichment: Principal and Agent.** Equitable clawback is a restitutionary remedy based on principles of unjust enrichment and the faithless servant doctrine. It establishes a mandate that an agent who engages in activities that breach the agent's fiduciary duties to the principal is not entitled to and must forfeit any compensation for services rendered during the period of the breach.

53. **Jury Instructions: Appeal and Error.** Any jury instruction is subject to the harmless error rule, which requires a reversal only if error adversely affects the substantial rights of the complaining party.

54. **Torts: Intent: Proof.** To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that

the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.

55. **Torts: Employer and Employee.** Factors to consider in determining whether interference with a business relationship was unjustified include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. The issue is whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.

56. **Contracts.** An individual's interest in prospective economic advantage receives less protection than his or her enforceable contract rights.

57. **Torts: Proof.** The party alleging tortious interference has the burden of proving that the conduct did not fall within the competitor's privilege.

58. **Torts: Intent.** One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if (1) the relation concerns a matter involved in the competition between the actor and the competitor, (2) the actor does not employ improper means, (3) the actor does not intend thereby to create or continue an illegal restraint of competition, and (4) the actor's purpose is at least in part to advance his or her interest in the competition with the other.

59. **Torts.** Improper means of competition has been described as physical violence, fraud, civil suits, and criminal prosecutions—though even these means may not be forbidden, depending upon the relation between the actor and the person induced, and the object sought to be accomplished by the actor.

60. **Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

Appeal from the District Court for Douglas County: J Russell Derr, Judge. Affirmed.

Robert M. Slovek and Dwyer Arce, of Kutak Rock, L.L.P., for appellant.

Aaron A. Clark, Ruth A. Horvatich, and Cody E. Brookhouser-Sisney, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellee Robert Dick.

Ryan M. Kunhart and Jeffrey J. Blumel, of Dvorak Law Group, L.L.C., for appellee Bland & Associates, P.C.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. NATURE OF CASE

An accountant left one firm in order to join another. Several clients followed the accountant to his new firm. The accountant, who was a shareholder and officer at his former firm, sued the former firm for failing to perform a mandatory provision in the shareholder agreement to buy out a departing shareholder's corporate shares at a price that accounted for any lost billings by virtue of clients' following a departing shareholder. The firm made numerous allegations in defense of the accountant's claim and brought counterclaims against the accountant, including breach of fiduciary duty and misappropriation of confidential information. The accountant's prior firm also brought third-party claims against the accountant's new firm, which included tortious interference with business expectations and a malicious prosecution claim in relation to a complaint made by the new firm to the Nebraska State Board of Public Accountancy (NSBPA). All claims presented to the jury were determined in favor of the accountant and his new firm. The accountant's former firm appeals, presenting 15 assignments of error challenging the allocation of peremptory strikes, the denial of its motion for directed verdict, the exclusion of certain evidence, and several of the jury instructions. We affirm the judgment.

## II. BACKGROUND

The underlying action was commenced by Robert Dick, an accountant, against Koski Professional Group, P.C. (KPG), a closely held professional corporation providing accounting services. Dick worked at KPG as an accountant for 22 years and eventually held the corporate office of vice president.

In 2015, Dick moved his practice to Bland & Associates, P.C. (Bland). Bland agreed to pay Dick a base salary plus a percentage commission on his clients' billings. Although not solicited to do so prior to his departure, many of Dick's clients transferred their business to Bland after Dick began working there. There was no noncompete agreement between Dick and KPG.

Dick had purchased 30 percent of KPG shares during his tenure at KPG, at a total purchase price of approximately $257,000. Some of the funds for the stock purchase were obtained through a loan by Randall Koski (Koski), president of KPG, to Dick. The loan was secured by a promissory note and set forth a payment plan and interest. At the time of his departure, Dick still owed approximately $63,000 on the loan. Dick continued the scheduled payments and paid off the balance in full before trial.

When Dick left KPG, he communicated to Koski that he wished for KPG to purchase his shares pursuant to the terms of the controlling shareholder agreement (Shareholder Agreement). The Shareholder Agreement described voluntary termination as an operative event requiring the shareholder to sell and the corporation to purchase all of the disposing shareholder's stock. The Shareholder Agreement set forth the purchase price for an operative event such as a shareholder's voluntary departure as 80 percent of the adjusted book value. The adjusted book value in such circumstances was based in part on "[r]etained [a]nnual [b]illings," described as the difference between KPG's total professional fees during the most recently completed fiscal year and all professional fees billed to clients who are no longer clients of KPG and were being served by the departing shareholder 1 year subsequent to departure. The repurchase under the Shareholder Agreement was to occur within 60 days of termination. The agreement further specified that KPG was to issue a promissory note to purchase the stock in 120 equal monthly installments with 5 percent per annum interest.

Koski disavowed a buyout obligation at the price set forth under the Shareholder Agreement. Koski believed that Dick's actions in relation to procuring his new employment had breached his fiduciary duties to KPG and the corporate bylaws and, further, that because of the promissory note, Dick had failed to offer the stock free of all liens. KPG never valued the shares or set a closing date for a repurchase. Dick sued.

## 1. Amended Complaint

Dick alleged breach of contract. Dick also asked for an order granting specific performance of the Shareholder Agreement compelling KPG to calculate the adjusted book value per share, deliver a promissory note secured by the pledge of stock, and pay in full all installment payments to repurchase the stock plus prejudgment interest and other interest provided under the Shareholder Agreement. He asked for an accounting or such other relief necessary to determine the value of his stock. Alternatively, Dick asked for an order accelerating the payment of all amounts due to purchase his stock and the entry of a monetary judgment representing the full adjusted book value owed by reason of KPG's repudiation and default. Dick also alleged violations of the Nebraska Wage Payment and Collection Act,[1] but dismissed that claim after trial.

## 2. Amended Answer

KPG generally denied the allegations set forth in Dick's amended complaint and alleged several affirmative defenses, including prior material breach and failure to satisfy a condition precedent. KPG alleged that Dick's breach of contract claim was barred by his own prior material breach of the Shareholder Agreement and bylaws, thereby excusing KPG's duty to perform. KPG alleged that Dick failed to satisfy a condition precedent of the applicable stockholder agreement by

---

[1] See Neb. Rev. Stat. §§ 48-1228 to 48-1234 (Reissue 2010, Cum. Supp. 2018 & Supp. 2019).

failing to return his stock to KPG free and clear of any security interests or encumbrances.

KPG did not allege a prior breach of fiduciary duty or good faith and fair dealing as affirmative defenses to Dick's breach of contract claim.

### 3. Counterclaims

KPG then set forth seven counterclaims against Dick, some of which mirrored the alleged affirmative defenses.

### (a) Breach of Fiduciary Duty

First, KPG alleged a counterclaim for breach of fiduciary duty. KPG asserted that Dick breached his fiduciary duties of loyalty and care, imposed by virtue of his being an officer and shareholder of a close corporation, by (1) disclosing KPG's confidential business techniques and commercial data to Bland; (2) failing to send out engagement letters on behalf of KPG to two different KPG clients in order to take those clients to Bland; (3) "'shopp[ing]'" KPG's long-term clients to other accounting firms to find the one that would offer him the largest fees for taking those clients to them; (4) engaging with Bland, while still working for KPG, in an agreement in which he would receive a 10-percent commission on all clients he brought to Bland from KPG, in violation of the rules of professional conduct of the NSBPA; (5) concealing from KPG his efforts to transition to a rival accounting firm; (6) breaking his specific promise to KPG that he would not contact KPG clients during that period of time; (7) mishandling and providing negligent accounting services to KPG clients; and (8) violating KPG's bylaws by sending KPG's confidential business techniques and commercial data to Bland.

While the underlying facts of this stated claim were the same as those referred to in the affirmative defense of unclean hands, KPG sought damages as a result of the alleged breaches, as well as a return of compensation paid to Dick during the period of his breach—under the "equitable claw back" doctrine.

#### (b) Breach of Shareholder Agreement

Second, KPG asserted that Dick breached the explicit terms of the Shareholder Agreement, as well as implied covenants of good faith and fair dealing, by demanding that KPG repurchase his stocks and by initiating litigation to compel the same, when Dick was allegedly unable to return his stock unencumbered. Like in its affirmative defense of prior material breach and failure to satisfy a condition precedent based on similar allegations, KPG asserted that it was excused from performing any further obligation under the Shareholder Agreement. KPG asked for damages as a result of Dick's breach.

#### (c) Breach of KPG's Bylaws

Third, and again repeating one of the allegations stated under breach of fiduciary duty, KPG alleged that Dick breached bylaws providing that officers and employees of KPG maintain and preserve confidentiality as to all business techniques, commercial data, formulas, goodwill, operational methods, product identifications, service marks, trademarks, trade names, and trade secrets, by disclosing confidential information to Bland in order to undercut KPG pricing for its clients. KPG alleged it suffered monetary damages as a result of the breach.

#### (d) Misappropriation of Trade Secrets

Fourth, KPG alleged that Dick violated Nebraska's Trade Secrets Act, Neb. Rev. Stat. § 87-501 et seq. (Reissue 2014), by utilizing KPG's trade secrets for his own benefit in the course of his employment with Bland. KPG asked for damages due to actual losses and unjust enrichment, as provided by § 87-504.

#### (e) Tortious Interference With Contact or Business Relationship or Expectancy

KPG's fifth counterclaim was based in part on the same allegations as those set forth in KPG's counterclaim alleging breach of fiduciary duties and in part on the additional alleged facts that (1) Dick had encouraged clients who switched from

KPG to Bland not to pay their outstanding balances with KPG and (2) Dick maliciously assisted Bland in filing a false complaint against KPG with the NSBPA. KPG sought damages.

### (f) Civil Conspiracy

Sixth, repeating allegations made under its breach of fiduciary duty and tortious interference claims concerning Dick's breach of KPG's bylaws by sending confidential information to Bland, KPG alleged that Dick conspired with Bland to "wrongfully co-opt KPG's niche practice, all while taking concerted steps to prevent KPG from discovering Dick's wrongful conduct." KPG sought damages for this alleged civil conspiracy.

### (g) Unjust Enrichment

Seventh, KPG asked for the return of certain amounts paid to Dick or on his behalf under the theory of unjust enrichment. Specifically, KPG sought reimbursement of a $16,000 discretionary bonus paid to Dick on the condition that he stay through an orderly transition process, which Dick allegedly did not do. KPG also sought reimbursement for $3,587.13 paid to cover Dick's health insurance premium for the fourth quarter of 2015, during which Dick no longer worked for KPG.

### 4. Third-Party Complaint

KPG brought a third-party complaint against Bland stating six claims for which KPG sought monetary damages: (1) tortious interference with an existing contract or business relationship or expectancy; (2) aiding and abetting a breach of fiduciary duty; (3) malicious prosecution based on Bland's commencement of NSBPA proceedings against KPG, allegedly without probable cause and with malice, "in an effort to bully and intimidate" KPG; (4) misappropriation of trade secrets as defined by KPG's bylaws and § 87-502(4); (5) civil conspiracy to willfully and maliciously interfere with KPG's business operations, customer relationships, and corporate opportunities; and (6) unjust enrichment through the receipt and

continued use of KPG's confidential business techniques and commercial data.

### 5. Pretrial Order Regarding 10-Percent Commission

KPG moved for partial summary judgment against Bland on its allegation that Bland's payment of a 10-percent commission to Dick for prior KPG clients violated the rules of professional conduct of the NSBPA and that this accordingly constituted tortious interference with its business relationships or expectations. Bland responded by filing a cross-motion for partial summary judgment against KPG, alleging that as a matter of law, the commission did not create a conflict of interest or violate the NSBPA's regulations, because it was paid directly by Bland to Dick and did not affect the amounts paid by a client or the outcome of an engagement between Bland and a client. Dick filed a separate motion for partial summary judgment for the same reasons as set forth in Bland's motion.

Following a hearing, the court overruled KPG's motion for partial summary judgment and granted Bland's motion for partial summary judgment on the issue of whether the commission violated NSBPA regulations. The court found as a matter of law that Bland was not violating NSBPA regulations by paying Dick a 10-percent commission on fees paid to Bland for work performed for clients Dick brought to Bland. The NSBPA rule in question, the court explained, prohibited commissions that would create a potential conflict of interest, such as a licensee's receiving a commission from an outside service provider for referring that provider's service to that licensee's client. The court did not rule on whether there was any other basis for concluding that Bland engaged in an unjustified intentional act of interference against KPG.

### 6. Peremptory Challenges

Prior to jury selection, the court issued a written order finding that the interests of Dick and Bland were sufficiently adverse such that each should have three peremptory

challenges. The jury selection process is not otherwise reflected in the appellate record.

### 7. Evidence Presented at Trial

The jury trial was held from October 1 through 12, 2018. The following evidence was adduced.

### (a) Dick Employed by Randall K. Koski, P.C.

Dick testified that he was hired at Randall K. Koski, P.C., in 1993. At that time, the firm was Koski's sole practice, established in 1986. Koski had as a client a nursing home chain and was looking for someone with health care experience. Dick had experience working with Medicare.

Dick testified that at Randall K. Koski, P.C., he specialized in cost reports and other accounting services for long-term health care facilities. He brought in his first client in 1995, at which time there were only three nursing homes being served by KPG. By the time Dick resigned, KPG served around 45 nursing homes.

Dick testified that since 1995, he had personally brought in every long-term health care client that Randall K. Koski, P.C., and KPG had served. A shareholder, Michelle Thornburg, described that while "Dick may have been the face of that networking," KPG resources assisted him in that effort significantly. Koski also generally disagreed with Dick's perspective that he was the driving force of KPG's growth in that area. According to Koski, long-term health care clients have always been between one-third and one-half of KPG's client base.

### (b) Shareholder Agreements, Stock Purchases, and Promissory Notes

In 1997, Koski filed with the Secretary of State an amendment to the articles of incorporation of Randall K. Koski, P.C., to change the corporation's name to that of KPG. The amendment, adopted by Koski as the sole shareholder, provided that "all other terms and conditions of the articles of incorporation

filed January 14, 1991 were reconfirmed and deemed to be in full force and effect."

In 1997, the first KPG shareholder agreement was signed by Koski, Dick, and Thornburg. Shareholder agreements were again signed by all relevant parties in 2005 and 2011. The relevant provisions were the same in each of these subsequently executed shareholder agreements.

In addition to the "mandatory sales and purchases" provisions that took into account any clients that leave with a voluntarily departing shareholder, the agreements provided for shareholder indebtedness to the corporation or a third-party secured creditor to be offset against the buyout price. The shareholder agreements further had a provision that stated:

> This Agreement contains the entire understanding among the parties and supersedes any prior understanding among the parties and agreements between them respecting the within subject matter. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein.

There was no reference in the KPG shareholder agreements to corporate bylaws. At the time of the corporation's formation, there were three shareholders, a few employees, and gross revenues of close to $500,000. When Dick resigned in 2014, there were four shareholders, over a dozen employees, and $1.8 million in gross revenue. The fourth shareholder, Adrian Lape-Brinkman, joined in 2010, after purchasing a 15-percent interest in KPG for $186,493.08.

Dick originally purchased 12.5 shares in KPG from KPG for $52,260.25. In 2000, Dick purchased additional shares in KPG from KPG for $40,356.

In 2005, Dick purchased 11.8 shares in KPG from Koski for $90,000, giving Dick a 24-percent ownership interest and reducing Koski's interest to 52 percent. The 2005 purchase was memorialized by a stock purchase agreement between

Dick and Koski and was financed by Koski on a 10-year repayment term with interest, delineated in a security agreement between Dick and Koski. In 2010, Dick again purchased shares in KPG from Koski for $74,597.23, at which point Dick owned 30 percent of KPG. Dick and Koski refinanced the remaining $41,000 unpaid balance of the 2005 loan into a new loan for the 2010 purchase, for a total loan of $115,000 plus interest.

Under the promissory note, Dick promised to pay $1,199.67 per month from January 1, 2010, through December 31, 2019. The evidence was uncontroverted that Dick never defaulted on any of the loan payments.

It was undisputed that after the underlying lawsuit was filed, Dick continued to make payments and Koski continued to accept those payments until Dick paid off the remaining balance in September 2019. The total amount paid by Dick for all the KPG shares he purchased was $257,998.74, plus $40,181.69 in interest under the loan from Koski.

### (c) Bylaws

KPG entered into evidence the bylaws of Randall K. Koski, P.C., adopted in 1990 when Koski was the sole owner and shareholder. The bylaws provided that "[a]ll officers, agents, and employees of [KPG] shall be required . . . to maintain and preserve confidentiality as to all business techniques, commercial data, formulas, good will, operational methods, product identifications, [etc.]" Koski testified that the Randall K. Koski, P.C., bylaws became the bylaws of KPG when the articles of incorporation for KPG were filed, since "[t]he only change in the corporation was the name . . . ."

### (d) Shareholder Disagreements

Dick testified that in 2014, he became concerned that KPG's resources were not sufficient to meet the continuing growth of the long-term health care client base. Dick suggested hiring more staff or merging with another accounting

firm. Koski and Thornburg, however, were not interested in expanding in that way.

Also, Dick and Lape-Brinkman began to feel that it was inequitable that the shareholders' salaries were not in any manner tied to the number of clients they brought to KPG or to the amount of work they did. All shareholders were paid the same base salary no matter how many shares they owned. The shareholders were then each given a yearly distribution of KPG's profits based on their percentage of shareholder interest and without regard to the amount of revenue they brought to the firm or the amount of work performed.

Dick estimated that he oversaw approximately $600,000 of work, while the other shareholders oversaw approximately $400,000 of work each, some of whom were getting paid the same as Dick for doing less work. According to Dick, none of the other shareholders practiced in his specialty. Koski asserted that any extra hours worked by Dick were due to time spent correcting an error that Koski believed Dick's negligence had created, while Dick and his client testified that the error had occurred previously when the client was doing his own accounting work.

One idea that Dick and Lape-Brinkman suggested to the other shareholders was that shareholders be given a commission or bonus for clients they bring to the firm. Dick described this as a "standard practice." At a shareholder meeting in November 2014, Koski and Thornburg rejected such ideas, but suggested a formal proposal.

Soon after the November 2014 meeting, Koski sent an email to the other shareholders stating his belief that "much damage has been done to [the] 'partnership'" as a result of the disagreement about compensation. Koski expressed that he did not believe an agreement could be reached that would make everyone happy. Koski concluded:

> The great irony here is that if I had always kept owner compensation confidential and none of you knew what

the other was making, everyone would be tickled with this year's compensation.

I have a plan to finalize 2014 compensation. It is predicated on the idea that we will remain together as a firm at least for most of 2015. If anyone does not feel that they can remain with the firm for most of 2015, allowing us time for an orderly sale, merger or liquidation, if necessary, please be honest with me and tell me that, for I do not wish to make a discretionary allocation to anyone who will not remain here through an orderly process. You might be thinking that we all lose if we liquidate, and you would be correct. Substantially.

I have decided that my salary for 2014 will be $160,000

. . . .

At the moment, following are my plans for a discretionary reduction in my compensation. I originally planned to allocate this to [Dick], [Thornburg,] and [Lape-Brinkman], as I have made known to you previously. [Thornburg] has very unselfishly asked me to allocate from her share $4,000 to Kelli and $2,000 to Annette and none to herself. The remainder of approximately $30,000 plus would go to [Dick] and [Lape-Brinkman] in whatever proportion you may agree upon. . . .

. . . .

For the record, I have enjoyed the camaraderie, whether it was real or imagined, and I hope it may continue into the future.

Dick thus received a $16,000 distribution. Dick testified that there was never any discussion of liquidating the firm, either prior to the email or afterward. The firm was never dissolved, and Dick stayed with KPG for the first 9 months of 2015.

In January 2015, a formal proposal was submitted, which the majority of the shareholders rejected. At some point after Dick left, the remaining shareholders were able to reach an agreement to change their compensation structure.

### (e) Employment Negotiations With
### Bland and Resignation

Dick submitted his resignation on September 30, 2015, effective immediately. Dick testified that he made sure all his pending work was completed prior to his departure. Dick did not give KPG notice that he was considering moving his practice elsewhere. Dick explained that he was worried KPG would fire him immediately if it found out he was considering other employment.

Dick described that he had originally begun communication with Bland about the possibility of a merger. But when it became clear that neither KPG nor Bland was interested in a merger, on May 28, 2015, Dick began discussing the possibility of moving his practice to Bland. Dick communicated with Bland through his wife's email account, which Dick testified was the email account he often utilized for his personal email communications.

### (f) Dick's "Book of Business"

During these negotiations, Bland requested that Dick send information relating to Dick's "book of business." Dick sent to Bland (from his wife's email account) a spreadsheet containing information about the volume, general location, price, and type of work Dick performed. It was understood that clients were free to go where they wished and that Dick's book of business was developed in his employment at KPG, where the clients might choose to remain. Nevertheless, the managing shareholder at Bland testified that Dick's book of business was relevant to putting together a compensation package for Dick.

The spreadsheet was entered into evidence at trial. It demonstrated chunks of hours and the total billings for each chunk (such as 34 hours for a $3,200 fee), with a description of the general type of work (such as "[t]ax" or "Medicaid"). The spreadsheet often indicated the time of year the work was due and sometimes indicated the state in which the work was performed. Clients were identified, if at all, by designations

such as "Owner A." The document summarized total billings in various categories such as "[a]udit," "[t]ax," "Medicaid," and "[r]etirement [p]lan" and then summarized total billings into date categories of "January - June," "July - September," and "October - December."

Dick testified that some of the information in the spreadsheet came from Dick's estimation of fees and hours, while other parts of the information came from the KPG computer database. According to Thornburg, only shareholders and two paraprofessionals who did billing had access to such fees-and-hours data in their computer system. Dick acknowledged that the database was password protected, but testified that the fees-and-hours information was public information.

Thornburg acknowledged that a range of KPG pricing information was given to potential clients and that clients were obviously aware of what they were being billed. Clients were not asked to keep that information confidential. Koski testified that KPG would share its billing rates with anyone, "because it tells them nothing," and that pricing information was given to each customer.

Both Bland and KPG provided potential clients with cost estimates, which the potential clients were free to share with others. KPG did so through its engagement letters, and Lape-Brinkman testified that there was nothing in the engagement letters that restricted a potential, current, or past client from disclosing to Bland or other firms what KPG charged for the described services. The managing shareholder at Bland testified that he always asked potential clients what fees they were currently paying before putting together a proposal, which the clients ordinarily freely disclosed. He generally sought that information in order to understand whether it would be worthwhile to make an offer, since Bland did not "want to undercut" and "take a losing job."

It was undisputed that long-term health care facilities generally must publicly disclose Medicaid cost reports, which include accounting fees. But Koski pointed out that those

fees could be a sum of multiple firms' work. KPG's website described the types of tax work KPG performed for its clients. It also listed the states in which it performed services.

During his testimony, Koski explained that he primarily took issue with Dick's sharing with Bland the historical information about services provided to KPG clients, KPG client locations, and number of hours spent servicing KPG clients. Koski stated, "Standard hourly billing rates are one thing, but what you actually realized on a client engagement is something else . . . ." Koski testified that the latter information was not publicly available. Koski described that such information could be used by a competitor to organize staff and other resources required to serve that client.

At no point did Dick relay to Bland any client names. At no point did Dick or anyone at Bland utilize the information in the spreadsheet or any other information to undercut KPG's rates or solicit new clients. The managing shareholder at Bland testified that he did not attempt to identify KPG clients from the information conveyed in the spreadsheet. The managing shareholder stated that Bland has never utilized the spreadsheet to solicit KPG clients or for any other competitive purpose. Dick testified that after sending the spreadsheet to Bland, he never looked at the information again.

### (g) Job Offer and 10-Percent Commission

By August 2015, Bland had offered Dick a job. At Bland, all accountants receive an extra payment of 10 percent of the billings on the first year of collections for all clients they personally bring to the firm. This has been Bland's policy for quite some time. In 2015, approximately 50 Bland employees received such a commission. Dick's position as an accountant at Bland meant he also would receive such a commission. The court excluded expert testimony proffered by KPG that Bland's 10-percent commission system violated the rules of professional conduct of the NSBPA.

### (h) KPG Clients That Left

Dick testified that he did not talk to any clients before resigning from KPG about his move to Bland, and there was no evidence contradicting this testimony. After his resignation, Dick did send out emails to some former clients informing them of his new place of employment and stating that he would appreciate having the opportunity to continue providing them services. Ultimately, 23 clients chose to follow Dick to Bland, while 37 clients stayed with KPG.

Koski testified that in the 18 months following Dick's resignation, 83 clients were "lost," while 37 stayed. Of those 83 clients, according to Koski, 38 originally followed Dick but only 23 remained with Dick a year after his departure from KPG. Koski could not strictly account for where the other long-term health care clients went, but opined that their loss was related to the "disruption" and "consternation" surrounding Dick's resignation.

The executives of nine of the clients who followed Dick from KPG to Bland testified that Dick did not reach out to them or solicit their business following his departure. Rather, they discovered Dick's departure from KPG employees, during a regular bidding process, or by other means. These clients then reached out to Dick directly.

In total, the executives of 13 clients who followed Dick testified. They all testified Dick never made any disparaging comments about KPG or offered to undercut KPG's pricing. Indeed, Dick assured one of those clients that KPG was fully equipped to continue to serve its needs. No evidence was presented that any former KPG client followed Dick to Bland because of better pricing.

According to Koski, Dick's departure resulted in a decline in KPG's revenue due to the loss of clients as well as the cost of the present litigation. KPG's expert witness testified that due to lost clients, KPG had experienced approximately $1.8 million in lost profits over a projected 10-year period and based on a 6.04-percent compounding growth in the clients' billings. The 10-year period was based on past longevity of KPG's

long-term health care clients. The expert also testified, over Dick's objection, that KPG had experienced "clawback" damages in the amount of $48,247.

KPG's expert admitted on cross-examination that he was directed which clients to include in the lost-profits calculation, and he did not investigate why the clients had left. He did not know whether any of those clients were one-time engagements, went to firms other than Bland, or were no longer in business. Furthermore, he included in his lost-profits calculations clients who had remained with KPG but whose billings decreased.

KPG's expert also testified that he had made no judgment in determining clawback damages whether Dick had worked diligently on behalf of KPG during the 4-month period he was negotiating with Bland prior to resigning.

During the expert's examination, KPG's counsel asked the court to allow the expert to recalculate the lost profits by removing certain clients Dick claimed to have identified during cross-examination that should have been excluded. The court sustained Dick's objection to such a late revision of the expert's report, but allowed the expert to testify as to the mathematical formula by which such a calculation could be made.

Dick's expert witness testified that only former clients of KPG that followed Dick to Bland should have been included in KPG's expert's calculations of lost profits. Clients who continued to have their work done by KPG and former clients who had contracted with KPG for a onetime project should have been excluded from KPG's expert's calculations, but were not. Dick's expert witness also opined that using 6.04 percent as the predicted growth rate was unreasonable. And she also took issue with the 10-year projection, noting that "to assume that every one of these is going to last ten years would be really overstating the life of that client base." Finally, Dick's expert witness opined that the approximately $200,000 for KPG's legal fees should not have been part of a lost-profits analysis.

According to her own analysis, Dick's expert witness testified that KPG did not suffer any lost profits as a result of

Dick's resignation. Dick's expert witness testified that the lost revenue of clients who went to Bland was less than the amount KPG previously had to pay for Dick's salary.

### (i) No Closing Under Shareholder
### Buyout Provision

Dick testified that he had been prepared to proceed under the Shareholder Agreement's buyout provision with a closing date of 60 days from the operative event of his resignation, which would have been November 29, 2015. According to Dick's calculations under the formulas set forth in the Shareholder Agreement, his shares had a total value of $470,312.51 and, under the Shareholder Agreement, KPG should have paid him approximately $60,000 per year over a 10-year payment plan outlined in the Shareholder Agreement, with the first monthly payment due on November 29.

Dick's expert witness confirmed those calculations, while KPG's expert calculated the value of the shares at $302,696. Although there was still an outstanding lien under the promissory note to Koski, Dick testified that he had been prepared to pay off that balance in connection with closing on the shares.

On October 3, 2015, Dick and Koski had a conversation wherein Dick made clear that he wanted his shares to be valued and repurchased. Koski asked Dick what he wanted for his shares. Dick responded that he wished for KPG to calculate the purchase price as provided under the terms of the Shareholder Agreement—though he might be willing to take a lesser amount in a lump sum "just to move on." According to Dick, Koski refused to purchase the shares under the terms of the Shareholder Agreement, stating that "there's too much money at stake; we're going to fight you." Thornburg testified that 2014 was the highest-revenue year in the history of the firm, which would result in "a pretty significant payout" for a departing shareholder.

According to Koski, he did not say, "We're going to fight you," but offered to try to work something out. Nevertheless, Koski believed that the Shareholder Agreement did not control

KPG's obligations, because Dick had not acted in good faith. Thus, any agreed-upon payout amount would not be commensurate to the sum under the formula of the Shareholder Agreement. Koski also testified, "[Dick] never offered to pay and deliver [the shares] free and clear of liens. He never offered it."

Dick testified that since his resignation, he has received no distributions or other income based on his shares and has no control over KPG operations, yet he has had to pay yearly taxes on KPG income by virtue of his continuing status as a shareholder. Dick testified that he has never had possession of any physical shareholder certificate—the shareholder agreements being the only documentation of the same. There was no evidence that physical shareholder certificates ever existed.

## 8. Motion for Directed Verdict Against Dick on Claim for Breach of Contract

Near the close of trial, before KPG rested, KPG moved for a directed verdict against Dick on its cause of action under the Shareholder Agreement. Specifically, KPG argued that Dick had failed to rebut, by demonstrating good faith, KPG's prima facie case for its affirmative defense that Dick had breached his fiduciary duty toward KPG. The court pronounced that it was overruling the motion.

The court observed that KPG's claim appeared primarily to be based on the alleged act of disclosing confidential information through the email disclosing billings. The court considered it to be a question for the jury whether such information was confidential. While KPG asserted that additionally, Dick's concealment of his negotiations with Bland was a breach of a fiduciary duty of "utmost honesty with his partners," the court did not agree.

The court noted that the case law did not support the proposition that an officer or shareholder who merely prepares to compete upon departure breaches a fiduciary duty. And the court rejected KPG's premise that Dick had committed a breach of fiduciary duty by soliciting clients after he

resigned at KPG—an act which the court noted was explicitly contemplated by the Shareholder Agreement. With regard to KPG's argument that Dick had a postresignation fiduciary duty because he was still a shareholder, the court said:

> Well, that's kind of a circular argument here, that you won't buy him back, so he's still a shareholder. You won't buy him back 'cause you say, Well, I don't have to because he breached his fiduciary duty. That's the position [KPG's] taken, so what's he supposed to do?

The court also found little merit to the contention that Dick had "stole[n]" KPG clients, when there was no agreement not to compete.

Further, the court believed that postresignation conduct was not alleged as part of KPG's claim for breach of fiduciary duty. The court expressed the belief that any breach of fiduciary duty or tortious interference could not as a matter of law operate as an affirmative defense to Dick's claim for breach of contract. The court stated that there was no shifting of the burden of proof without first proving Dick engaged in a breach of fiduciary duty, and KPG had not done so.

The court overruled renewed motions for a directed verdict against Dick on his breach of contract claim at the close of KPG's counterclaim and at the close of all the evidence.

### 9. Suppression of Evidence of Postresignation Acts in Alleged Breach of Fiduciary Duty

On the ground that the issue was not presented in the pleadings, the court later sustained during trial an objection by Dick preventing KPG from offering evidence of Dick's continuing fiduciary duty toward KPG as a shareholder after his resignation from KPG and becoming employed by Bland. The court reasoned that the issue was not pleaded. The court noted that under the allegation of breach of fiduciary duty, there were numerous specific facts pleaded under "[allegations] A through F," all of which described acts before resignation. The court explained, "[T]here is no G that includes, By continuing to

compete while continuing to be a shareholder, and that's a pretty big allegation."

The court also found no merit to a claim based on Dick's continuing duty as a shareholder when KPG refused to redeem Dick's shares. Finally, the court noted that there was nothing pleaded regarding any alleged failure to tender the shares.

KPG did not make an offer of proof.

### 10. Motion to Amend Pleadings

The court overruled a related motion to amend the pleadings to conform to the evidence. Specifically, the court rejected any attempt by KPG to interject at such a late juncture the theory that Dick had a continuing fiduciary duty toward KPG by virtue of still being a shareholder. The court noted that in the amended pleadings filed 2 years after Dick's resignation and consisting of 143 paragraphs with numerous specific allegations of alleged breaches of fiduciary duty, "[n]owhere does it talk about breaching, continuing to breach his fiduciary duty by virtue of holding on to his shares."

The court also again observed that Dick had wanted to redeem his shares and that KPG "didn't take the position they're not worth as much," but, rather, "took the position I don't have to pay him anything." The court found it to be a "circular argument" that "[w]e won't buy his shares and he can't compete by virtue he still has fiduciary obligation." That was "a pretty big issue" that "should have been dealt with, if it needed to be dealt with, it should have been dealt with before."

### 11. Motions for Directed Verdict on KPG's Counterclaim and Cross-Claim

After KPG presented its evidence on its counterclaim and third-party claims, KPG moved for a directed verdict on those claims. Dick moved for a directed verdict on his claim against KPG for breach of the Shareholder Agreement and against KPG on its counterclaims. Bland also moved for a directed verdict in its favor on KPG's third-party claims, including its

claim for malicious prosecution. The court overruled all the motions, and the parties discussed jury instructions.

## 12. Jury Instructions

At the jury instructions conference, KPG proposed numerous instructions and special verdict forms that the court ultimately refused to give and which will be set forth in more detail in the analysis section. Forty-seven instructions were given by the court to the jury.

The jury was instructed in instruction No. 2 regarding the theories under which KPG alleged it had not just a defense against Dick's breach of contract claim but counterclaims against Dick and third-party claims against Bland for damages. It provided in part:

> [KPG] alleges that it does not have to repurchase the stock because Dick breached his fiduciary duty as an employee and shareholder of [KPG] by disclosing alleged confidential information of [KPG] and by discussing employment possibilities with Third Party Defendant Bland . . . while still an employee and shareholder of [KPG].
>
> [KPG] has asserted claims against Dick for:
> • Breach of fiduciary duty
> • Breach of Shareholder Agreement
> • Breach of [KPG's] Corporate by-laws
> • Misappropriation of [KPG] trade secrets
> • Tortious interference with business relationships and/or expectancy
> • Civil conspiracy
> • Unjust enrichment
>
> [KPG] has asserted claims against Bland for:
> • Tortious interference with business relationships and/or expectancy
> • Aiding and abetting Dick's alleged breach of fiduciary duty to [KPG]
> • Malicious prosecution
> • Misappropriation of [KPG's] trade secrets

• Civil conspiracy
• Unjust enrichment

Further instructions elaborated on the elements of these claims. These included instructions describing the elements of aiding and abetting a breach of fiduciary duty and malicious prosecution.

Regarding breach of fiduciary duty, instruction No. 5 informed the jury that because Dick was an officer, director, and shareholder, a fiduciary relationship existed between Dick and KPG. This relationship "imposes the responsibility to disclose any conflicts between Dick's interests and KPG's interests that might make him act in his own best interests at the expense or the detriment of [KPG]." Furthermore, "[a]s a fiduciary, Dick must exercise the utmost good faith in all his dealings with the other [KPG] shareholders and must always act for the common benefit of all."

Instruction No. 8 stated that "[s]hareholder employees in a close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another, to act among themselves in the utmost good faith and loyalty." But the instruction described that "[a]n individual's fiduciary duty ends upon termination of the employment relationship." "However," it further explained, while an employee has a duty not to compete with his or her employer during employment,

> employees, including employees with fiduciary duties, may plan and prepare for their competing business while still employed without breaching the duty of loyalty. Employees, including employees with fiduciary duties, are allowed to discuss job offers, while still employed, to engage in future competition with their employer without incurring liability.
>
> While planning and preparing for a competing business is permissible, an employee may not act in direct competition with his or her employer while still employed. Factors showing that an employee acted in direct competition

during his or her employment include the following: use of confidential and trade secret information acquired from the employer to compete; soliciting customers and clients to join the competing business before the end of the employment relationship; or committing some other fraudulent or unlawful act aimed at destroying the employer's business. To give rise to liability, the alleged disloyal acts must substantially hinder the employer in the continuation of its business.

Instruction No. 9 informed the jury that KPG asserted that Dick breached his fiduciary duty to KPG "in one or more of the following ways: . . . Violated [KPG's] bylaws by disclosing [KPG's] alleged confidential information to Bland; . . . Failed to send out an Engagement Letter to [two named entities] in an effort to undermine [KPG's] relationships with clients."

Instructions Nos. 11 through 15 described claims based on misappropriation of "trade secret/confidential information." Instruction No. 12 set forth:

Confidential information and trade secrets are defined as information including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:

(a) derives economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Confidential and trade secret information must have independent economic value. To be considered confidential and trade secret information, possession of the secret information must confer a competitive advantage.

Matters of public knowledge or of general knowledge in an industry are not confidential information or trade secrets; confidential information or a trade secret is something known to only a few and not susceptible of general knowledge. Confidential information and trade secrets

must be particular secrets of [KPG] and not the general secrets of the trade in which [KPG] is engaged. If information is ascertainable at all by any means that are not improper, the information is not confidential information or a trade secret.

Instruction No. 13 stated:

If an alleged trade secret or confidential information does not have independent economic value, the information is not entitled to confidential information or trade secret protection under Nebraska law. To be considered confidential and trade secret information, possession of the secret information must confer a competitive advantage.

Information disclosed to customers without any confidentiality requirement, including pricing information, is not confidential information.

Instruction No. 14 set forth the definition of the term "misappropriation" under Nebraska's Trade Secrets Act.

In addition to general instructions, the court gave the jury the following 11 special verdict forms:

#### (a) Dick's Claim for Stock Repurchase (Form 1)

The jury was asked in special verdict form 1 to determine Dick's claims against KPG for stock repurchase pursuant to the Shareholder Agreement.

#### (b) KPG's Claims Against Dick (Forms 2 Through 4)

The jury was asked in special verdict forms 2 through 4 to determine KPG's claims against Dick for (1) breach of fiduciary duty, (2) tortious interference with a business relationship or expectancy, (3) misappropriation of trade secrets or confidential information, (4) unjust enrichment, and (5) civil conspiracy.

#### (c) KPG's Conspiracy Claim Against Dick and Bland (Form 5)

The jury was asked in special verdict form 5 to determine KPG's claim of civil conspiracy against Dick and Bland.

#### (d) KPG's Claims Against Bland
#### (Forms 6 Through 9)

The jury was asked in special verdict forms 6 through 9 to determine KPG's claims against Bland for (1) tortious interference with a business relationship or expectancy, (2) misappropriation of trade secrets or confidential information, and (3) unjust enrichment.

#### (e) KPG's Damages Calculations
#### (Forms 10 and 11)

Special verdict forms 10 and 11 were simple damages forms with blanks for the jury to fill in the amount of damages in the event the jury found for KPG on "any of its claims." Instruction No. 10 referred generally to claims by KPG against Dick, while instruction No. 11 referred generally to claims by KPG against Bland.

### 13. Jury Verdict

On October 15, 2018, the jury found against KPG on all claims presented by the special verdict forms and in favor of Dick on his claim for stock repurchase, awarding Dick $470,312.51, which the jury determined to be the repurchase price.

KPG timely filed a notice of appeal following entry of the final judgment. Dick and Bland cross-appeal.

### III. ASSIGNMENTS OF ERROR

KPG assigns that the district court erred by (1) granting Dick and Bland twice as many peremptory strikes as KPG; (2) denying KPG's motion for directed verdict on the ground that Dick had breached his fiduciary duty; (3) denying KPG's motion for directed verdict on the ground that Dick failed to prove he acted in good faith; (4) excluding evidence of Dick's breach of fiduciary duty after his resignation as a KPG officer or, alternatively, refusing to allow KPG to amend its pleadings to conform to the evidence; (5) refusing to instruct the jury on KPG's affirmative defense that Dick's breach of

fiduciary duty could constitute a prior material breach of the Shareholder Agreement that excused KPG from performance; (6) refusing to instruct the jury on KPG's affirmative defense that Dick's breach of KPG's bylaws could constitute a prior material breach of the Shareholder Agreement that excused KPG from performance; (7) refusing to instruct the jury on KPG's affirmative defense that Dick's breach of the covenant of good faith and fair dealing could constitute a prior material breach of the Shareholder Agreement that excused KPG from performance; (8) refusing to instruct the jury that it must find Dick satisfied all conditions precedent in order to find the Shareholder Agreement enforceable; (9) refusing to instruct the jury on the corporate opportunity doctrine; (10) refusing to instruct the jury on equitable clawback damages; (11) instructing the jury that KPG bore the entire burden of proving Dick breached his fiduciary duty to KPG; (12) instructing the jury on the lower duty of loyalty owed by an employee, instead of the fiduciary duty owed by an officer and shareholder in a close corporation; (13) instructing the jury that KPG's claim for breach of fiduciary duty was based on two grounds only, the violation of KPG's bylaws and Dick's failure to send an engagement letter to KPG clients before his resignation, when KPG pled and offered evidence at trial of Dick's concealment, sharing confidential information with a competitor, and other actions demonstrating a failure to exercise the utmost good faith; (14) instructing the jury that KPG's confidential information must satisfy the legal definition of a trade secret to be protected; and (15) holding as a matter of law that Bland's payment of the commissions to Dick did not violate the rules of professional conduct of the NSBPA and excluding evidence of the improper commissions from trial.

Dick and Bland asserted cross-appeals in their briefs. Dick assigned in his brief on cross-appeal that the district court erred by overruling his motion for directed verdict against KPG on its counterclaims against him, because KPG failed to prove that any alleged misconduct by Dick proximately caused KPG damages and also because KPG had failed to establish

damages with reasonable certainty. Bland similarly assigned on cross-appeal in its brief that the district court erred by overruling its motion for directed verdict against KPG on its third-party claims against it, because KPG failed to prove that any alleged misconduct by Bland proximately caused damages and failed to establish any damages with reasonable certainty.

## IV. STANDARD OF REVIEW

[1] The allocation of peremptory challenges in a multiparty civil suit is left to the discretion of the trial court and will be reviewed for an abuse of discretion.[2]

[2] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.[3]

[3] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[4]

[4] A party may not complain of the failure of the trial court to instruct on issues that are outside the scope of the pleadings.[5]

---

[2] See, *Tidemann v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719 (7th Cir. 2000); *Blount v. Plovidba*, 567 F.2d 583 (3d Cir. 1977); *Globe Indemnity Co. v. Stringer*, 190 F.2d 1017 (5th Cir. 1951); *Sommerkamp v. Linton*, 114 S.W.3d 811 (Ky. 2003); *Premier Therapy, LLC v. Childs*, 75 N.E.3d 692 (Ohio App. 2016); *Gallegos v. Southwest Com. Health Services*, 117 N.M. 481, 872 P.2d 899 (N.M. App. 1994).

[3] *Krejci v. Krejci*, 304 Neb. 302, 934 N.W.2d 179 (2019).

[4] *Foundation One Bank v. Svoboda*, 303 Neb. 624, 931 N.W.2d 431 (2019).

[5] *Deck v. Sherlock*, 162 Neb. 86, 75 N.W.2d 99 (1956).

[5] Jury instructions must be read together; they must be read conjunctively, rather than separately in isolation.[6]

[6] If the jury instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[7]

[7] When a motion for directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and where the issues should be decided as a matter of law.[8]

[8] Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.[9]

## V. ANALYSIS

KPG argues that the jury's verdict in Dick's breach of contract claim should be reversed because KPG was deprived of a fair trial by virtue of the district court's allocation of three peremptory strikes each to Dick and Bland, rather than three shared peremptory strikes. In the event we are unpersuaded that the allocation of peremptory challenges requires a new trial, KPG asserts that a new trial on Dick's breach of contract claim is necessary because KPG was prejudiced by the district court's failure to instruct the jury that prior material breaches by Dick of his fiduciary duty, corporate bylaws, or his obligations of good faith and fair dealing would excuse KPG's performance under the Shareholder Agreement and that there

---

[6] *Malone v. American Bus. Info.*, 264 Neb. 127, 647 N.W.2d 569 (2002).

[7] *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012).

[8] See *United Gen. Title Ins. Co. v. Malone*, 289 Neb. 1006, 858 N.W.2d 196 (2015).

[9] *Id.*

can be no breach of a promise until all conditions precedent have been performed.

KPG argues that the judgments against it on its counterclaims for breach of fiduciary duty and for breach of corporate bylaws should also be reversed. On KPG's counterclaim for breach of fiduciary duty, KPG asserts that the court should have granted its motion for a directed verdict. Alternatively, KPG asserts that a new trial is required on its counterclaim for breach of fiduciary duty because the court (1) instructed that Dick's fiduciary duty ended upon his resignation and excluded evidence of Dick's postresignation conduct; (2) failed to instruct that Dick's conduct presumptively breached his fiduciary duty and that therefore, the burden shifted to Dick to prove his actions were in good faith; (3) failed to instruct on the corporate opportunity doctrine; and (4) failed to instruct on equitable clawback damages. On KPG's counterclaim for breach of the corporate bylaws, KPG argues that it was prejudiced by jury instructions that defined a trade secret and confidential information the same way.

Lastly, KPG argues that we should reverse the judgment against it on its cross-claim against Bland for tortious interference. KPG argues it was prejudiced by the court's exclusion of expert testimony that the 10-percent commission paid to Dick by Bland on all new clients was unethical under the NSBPA.

## 1. Peremptory Challenges
### (Assignment of Error No. 1)

We first address KPG's assertion that the judgment in favor of Dick on his breach of contract claim must be reversed and that the cause must be remanded for a new trial due to the unwarranted allowance of peremptory challenges. KPG argues that Dick and Bland were on the "same side" of the lawsuit, that their interests were not adverse to each other, and that thus, both error and prejudice must be presumed by their six-to-three advantage in peremptory challenges.

[9-11] In Nebraska, the number of peremptory challenges allowable in civil actions is governed by case law and """"unwritten rules of court.""""[10] A party can exercise the peremptory challenge to remove a potential juror on the basis of that party's belief that the juror's status as a member of some cognizable group will prejudice his or her attitude toward that party's case.[11] We have said that under these rules, where there are multiple parties on the same side of a lawsuit, each side of the lawsuit is entitled to a total of three peremptory challenges, unless the multiple parties' interests are adverse to each other.[12]

[12,13] In *Gestring v. Mary Lanning Memorial Hosp.*,[13] we reversed the judgment obtained after the trial court granted three peremptory challenges to the plaintiff, who was a deceased patient's personal representative, while also granting three peremptory challenges each to multiple defendants involved in the deceased's care. We explained that additional peremptory challenges should be granted to multiple parties on the same side of a civil lawsuit only after the trial court has considered all of the circumstances of the case and determined that the interests of those multiple parties are adverse to each other. We elaborated that multiple parties on the same side of a civil lawsuit are adverse to each other when a good-faith controversy exists between them over an issue of fact that the jury will decide.[14] The fact that one party may have to defend against a theory of recovery not asserted against the other does not in itself mean that the two parties' interests are adverse.[15]

---

[10] *Gestring v. Mary Lanning Memorial Hosp.*, 259 Neb. 905, 912, 613 N.W.2d 440, 448 (2000).

[11] See *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965).

[12] *Gestring v. Mary Lanning Memorial Hosp., supra* note 10.

[13] See *id.*

[14] See *id.*

[15] See *id.*

[14] Focusing on multiple defendants who are on the same side of a civil lawsuit, we held in *Gestring* that relevant circumstances to determine whether the defendants' interests are adverse to each other include but are not limited to (1) whether separate acts of misconduct were alleged against the separate defendants, (2) whether comparative negligence principles applied to the case, (3) the type of relationship among the defendants, (4) whether cross-claims or third-party complaints had been filed and the positions taken therein, (5) information disclosed on pretrial discovery, and (6) representations made by the parties.[16] Other jurisdictions allow additional peremptory challenges to multiple parties whose interests are "'diverse,'" considering similar factors and including whether the parties' interests are antagonistic as one of the factors to be considered.[17]

We have never directly addressed a circumstance such as that presented here where the parties that were each granted three peremptory strikes are a plaintiff and a third-party defendant who are on the "same side" of the defendant's counterclaims and third-party claims. The lawsuit was brought by Dick against KPG, alleging breach of contract and violations of the Nebraska Wage Payment and Collection Act (a claim that was later dismissed). Bland had no interest in those claims and was brought into the action by KPG, which asserted jointly against Bland and Dick tortious interference, conspiracy to commit tortious interference, misappropriation of trade secrets, and unjust enrichment. KPG also asserted a claim for tortious interference against Dick and asserted a claim against Bland for aiding and abetting that breach. But KPG asserted third-party claims of malicious prosecution and unlawful commissions against Bland, which KPG did not assert against Dick. Further, KPG asserted counterclaims of breach of the Shareholder

---

[16] See *id.*

[17] See *Carraro v. Wells Fargo Mortg. & Equity*, 106 N.M. 442, 443, 744 P.2d 915, 916 (N.M. App. 1987).

Agreement and breach of corporate bylaws, which were not asserted against Bland. To summarize, separate acts of misconduct were alleged against Dick and Bland.

Nevertheless, in support of its assertion that the court erred in its allocation of peremptory challenges, KPG points out that Dick and Bland had a joint defense agreement whereby the attorneys could share information. This is not disputed. At issue is its import in an inquiry regarding allocation of peremptory challenges.

We do not decide that question here, however, because KPG has failed to preserve in the record evidence that it exhausted all its peremptory challenges, thereby leaving the record insufficient to support its assignment of error even if we found merit to KPG's legal premise. In *Steele v. Encore Mfg. Co.*,[18] the Nebraska Court of Appeals held that because there was no record concerning the number of peremptory challenges that the plaintiff had actually utilized, it could not address the plaintiff's allegation that the trial court erred by refusing his request to give him the same number of peremptory strikes as each of the codefendants. Similarly, in *Petsch & McDonald v. Hines*,[19] we held that we could not address a defendant's argument that the trial court erred by failing to grant it and its codefendant each the full number of three peremptory challenges, because the record did not demonstrate the extent to which either defendant exercised the peremptory challenges allotted.

It is true that in *Gestring*, we held that prejudice was presumed when the court granted the codefendants three peremptory strikes each despite their not adverse interests.[20] We reasoned that when no good-faith controversy exists between multiparty defendants and they are awarded extra peremptory challenges, the defendants can pool their challenges against the plaintiff, affording them undue influence over the composition

---

[18] *Steele v. Encore Mfg. Co.*, 7 Neb. App. 1, 579 N.W.2d 563 (1998).

[19] *Petsch & McDonald v. Hines*, 110 Neb. 1, 192 N.W. 963 (1923).

[20] *Gestring v. Mary Lanning Memorial Hosp., supra* note 10.

of the jury and placing the single-party plaintiff at a distinct tactical disadvantage that implicates the plaintiff's right to a fair trial.[21] And when additional challenges are granted to a party absent a showing that his or her interests are adverse to other parties on the same side of a civil lawsuit, prejudice will be presumed and the judgment must be reversed.[22] We explained that the proper allocation of peremptory challenges is a substantial right pervading the trial process and that it would be impossible for a complaining litigant to prove prejudice by reconstructing what might have been had the jury been properly constituted.[23]

[15] But we did not discuss in *Gestring* whether the record reflected if the plaintiff actually utilized all the peremptory strikes allocated. To the contrary, our opinion appears to reflect an understanding that the parties utilized all their peremptory challenges. We do not read *Gestring* as calling into question the longstanding rule in Nebraska that a party raising on appeal a denial of due process based on a disparate number of peremptory challenges must demonstrate through the record that the objecting party utilized the allotted peremptory challenges. This rule is supported by other jurisdictions that hold that in order to establish reversible error in the allocation of peremptory challenges, a "minimal showing" of prejudice must be made by demonstrating on the record that the appellant exercised the peremptory challenges allotted.[24] It is well established in the case law that one who does not exercise all of his or her peremptory challenges cannot assign as error the court's refusal to allow a greater number or a lesser number to the opposing parties.[25] The assignment of error is

---

[21] See *id.*

[22] See *id.*

[23] See *id.*

[24] See *Goldstein v. Kelleher*, 728 F.2d 32, 37 (1st Cir. 1984). Accord *State v. Greer*, 39 Ohio St. 3d 236, 530 N.E.2d 382 (1988).

[25] See, *Conn. Mut. Life Ins. Co. v. Hillmon*, 188 U.S. 208, 23 S. Ct. 294, 47 L. Ed. 446 (1903); *Kloss v. United States*, 77 F.2d 462 (8th Cir. 1935).

based on the inequality of the challenges, but if the appellant has failed to exhaust the challenges allotted, then the inequality was the appellant's choice.

We find no merit to KPG's contention that the allocation of peremptory challenges requires a new trial.

## 2. Dick's Breach of Contract Claim
### (Assignments of Error Nos. 5 Through 8)

We turn next to KPG's arguments that we should reverse the judgment in favor of Dick on his breach of contract claim due to the court's refusal to give KPG's requested jury instructions on prior material breach and failure to satisfy a condition precedent. KPG argues that it was prejudiced by the court's refusal to instruct the jury on KPG's affirmative defenses of prior material breach based on either Dick's prior breach of fiduciary duty, Dick's prior breach of KPG's bylaws, or Dick's prior breach of the covenant of good faith and fair dealing. Further, based on Dick's failure to deliver written shares free and clear of all liens, KPG asserts that the district court erred by refusing to instruct the jury that it must find that Dick satisfied all conditions precedent in order to find the Shareholder Agreement enforceable.

To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[26] Furthermore, a party may not complain of the failure of the trial court to instruct on issues that are outside the scope of the pleadings.[27] On appellate review, jury instructions must be read together; they must be read conjunctively, rather than separately in isolation.[28] If the instructions given, which are taken as a whole, correctly

[26] *Foundation One Bank v. Svoboda, supra* note 4.

[27] *Deck v. Sherlock, supra* note 5.

[28] *Malone v. American Bus. Info., supra* note 6.

state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[29]

[16-19] Shareholder agreements are construed according to the principles of the law of contracts.[30] A suit for damages arising from breach of a contract presents an action at law.[31] The meaning of an unambiguous shareholder agreement, like any contract, is a question of law.[32] Matters seeking avoidance of a valid contract are affirmative defenses.[33]

(a) Failure to Satisfy All
Conditions Precedent

The alleged condition precedent KPG wished the jury to consider was Dick's obligation under the Shareholder Agreement to deliver, in exchange for payment of the purchase price, the certificates of any shares of the stock purchased, free and clear of all liens, claims, security interests, and encumbrances, duly endorsed. KPG tendered the following instruction:

> To recover for breach of contract, . . . Dick must prove that KPG made a promise, breached the promise, and caused him damage and that any conditions precedent were satisfied. Generally[,] there can be no breach of a promise until all the conditions qualifying it have happened or been performed.

Further, KPG tendered a special verdict form for the jury to state whether Dick had met his burden to show by a greater weight of the evidence that he had satisfied a condition precedent to enforcement of the Shareholder Agreement. We agree

---

[29] *InterCall, Inc. v. Egenera, Inc., supra* note 7.

[30] 18A Am. Jur. 2d *Corporations* § 567 (2015).

[31] *Goes v. Vogler*, 304 Neb. 848, 937 N.W.2d 190 (2020).

[32] See, *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016); *Davenport Ltd. Partnership v. 75th & Dodge I, L.P.*, 279 Neb. 615, 780 N.W.2d 416 (2010); *Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 720 N.W.2d 886 (2006).

[33] 17B C.J.S. *Contracts* § 891 (2011).

with the district court that KPG's tendered instruction on failure to satisfy conditions precedent was not warranted by the evidence.

Dick's claim against KPG was based on the provision of the Shareholder Agreement entitled "Mandatory Sales and Purchases," found in article III. Under that provision, read together with the definition of "Operative Event" in article I and that of "Determination of Purchase Price on Account of Other Operative Events" in article V, "[u]pon the occurrence of" the "Operative Event" of "termination of a Shareholder's status as an employee of [KPG] occurring by reason of . . . such Shareholder's voluntary act," the shareholder "shall be required to sell and [KPG] shall be required to purchase all of the Disposing Shareholder's Stock of [KPG]" at "80% of the adjusted book value per share of Stock as of the end of [KPG's] most recently completed fiscal year."

"Adjusted Book Value" was defined as the sum of the book value per share of stock of [KPG], computed exclusive of goodwill, and the difference, divided by the number of outstanding shares, between the retained annual billings and deferred tax liability.

"Retained Annual Billings" were defined as "the total professional fees billed by [KPG] during [its] most recently completed fiscal year less all professional fees billed to clients who are no longer clients of [KPG] and are now being served by the Disposing Shareholder one year subsequent to the Operative Event."

Under article V of the Shareholder Agreement,

the estimated purchase price shall be paid by the delivery of a promissory note, in negotiable form, to the order of the Disposing Shareholder, in which [KPG] engages to pay the balance of such purchase price in one hundred twenty (120) equal monthly installments, with interest on the unpaid balance at the rate of five percent (5%) per annum as of the closing date.

Further under article V, "The promissory note shall be secured by the pledge of stock purchased thereby, with [KPG]

agreeing to execute security instruments covering such pledged stock, unless such pledge arrangement is waived by the disposing shareholder."

The condition precedent KPG alleged had not been satisfied is contained under "Closing Date" in article VI. The provision states in full:

> Section 6.1. Delivery Of Written Documents; Closing Date. *Upon the closing of any purchase and sale* pursuant to this Agreement, the Disposing Shareholder, or his legal representative, *shall deliver* to [KPG] or the Nondisposing Shareholders, or both, as the case may be, *in exchange for payment of the purchase price*, *the certificate(s) of shares of the Stock being purchased, free and clear of all liens, claims, security interests and encumbrances*, duly endorsed for transfer and bearing any necessary documentary stamps, and such assignments, certificates of authority, tax releases, consents to transfer by a fiduciary or representative of the Disposing Shareholder, and any instruments in evidence of the title of the Shareholder and of the parties' compliance with this Agreement, the Federal and State securities laws, and any other agreements or regulations, as may be recommended by legal counsel for [KPG].
>
> The closing date shall be within sixty (60) days after the Operative Event giving rise to the transaction but otherwise to be determined by [KPG] on ten (10) days prior written notice to the Disposing Shareholder.

(Emphasis supplied.)

A provision for "General Compliance" under article VII, "Shareholder Compliance and Consent," states:

> The parties hereto shall not hinder or interfere with, or cause to be interfered with in any manner whatsoever, the purchase or sale of the Stock of a deceased or Disposing Shareholder pursuant to this Agreement, or the carrying out of any of the terms of this Agreement to the prejudice of any Disposing Shareholder or his estate as the case may be.

A provision for "Shareholder Indebtedness to be Offset," also under "Shareholder Compliance and Consent," states:

> Notwithstanding anything appearing to the contrary in this Agreement, the purchase price payable to the Disposing Shareholder may be paid, partly or wholly, at [KPG's] option, by cancellation or offset of all or any portion of any then outstanding indebtedness of such Disposing Shareholder to [KPG]. Notwithstanding anything appearing to the contrary in this agreement, the purchase price payable to the Disposing Shareholder may be paid partly or wholly, at [KPG's] option, by payment to any third party secured creditor of all or any portion of any then outstanding indebtedness of such Disposing Shareholder which is secured by the pledge of stock of [KPG] and any payment to the third party secured creditor shall reduce the amount of the purchase price herein.

[20,21] Courts have struggled for centuries with differentiating between conditions and promises.[34] A condition precedent is a condition that must be performed before the parties' agreement becomes a binding contract or a condition which must be fulfilled before a duty to perform an existing contract arises.[35] This is in contrast to a promise in a contract, the nonfulfillment of which is a breach, i.e., the failure to perform that which was required by a legal duty, and the remedy lies in an action for damages.[36]

[22,23] Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract.[37] The words "as a condition for" are

---

[34] *Harmon Cable Communications v. Scope Cable Television*, 237 Neb. 871, 468 N.W.2d 350 (1991).

[35] *Cimino v. FirsTier Bank*, 247 Neb. 797, 530 N.W.2d 606 (1995).

[36] See *Harmon Cable Communications v. Scope Cable Television, supra* note 34.

[37] *Weber v. North Loup River Pub. Power*, 288 Neb. 959, 854 N.W.2d 263 (2014).

clearly language intended to create a condition precedent.[38] Terms such as "if," "provided that," "when," "after," "as soon as," "subject to," "on condition that," or some similar phrase are evidence that performance of a contractual provision is a condition; however, an intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language.[39] Where the parties' intent is not clear, the language is generally interpreted as promissory rather than conditional.[40]

There is nothing in the Shareholder Agreement suggesting that delivery of certificates of shares of KPG stock, free and clear of all liens, claims, security interests, and encumbrances, was a condition precedent to KPG's duty to purchase the shares of the disposing shareholder, which is the general duty upon which Dick's breach of contract claim rests. Rather, KPG's duty to purchase was expressly triggered under the Shareholder Agreement by "any Operative Event," which expressly included a shareholder employee's voluntary departure.

Focusing on KPG's more specific obligation to deliver a promissory note, described under "Payment," such obligation is "at the closing of such purchase." And the delivery of written shareholder documents, upon which KPG's affirmative defense of failing to satisfy a condition precedent rests, is triggered under the Shareholder Agreement "[u]pon the closing of any purchase and sale pursuant to this Agreement" and "in exchange for payment of the purchase price."

[24,25] This is, at best, a description of a simultaneous exchange, entailing mutual conditions precedent.[41] In such a situation, liability under the contract by the first party is

---

[38] *Lee Sapp Leasing v. Catholic Archbishop of Omaha*, 248 Neb. 829, 540 N.W.2d 101 (1995).

[39] See *id.*

[40] *Weber v. North Loup River Pub. Power, supra* note 37.

[41] 13 Richard A. Lord, A Treatise on the Law of Contracts by Samuel Williston § 38:8 (4th ed. 2003 & Supp. 2020).

triggered by an offer of tender by the second party, which is conditional upon contemporaneous performance of the first.[42] Tender is an offer to perform a condition or obligation, coupled with the present ability of immediate performance, so that, were it not for the refusal of cooperation by the party to whom tendered, the condition or obligation would be immediately satisfied.[43]

[26,27] Thus we have noted that a formal tender of shares is not necessary in order to fix liability on a purchaser for the breach of the purchaser's contract when the contract provides that the seller is to hold the stock and deliver it when called upon.[44] We have also noted that a formal tender of shares is not required when the buyer declares his intention not to perform; in such cases, it is sufficient that the seller is ready, willing, and able to deliver the stock.[45] Tender before suit is filed is waived where the party entitled to payment, by conduct or declaration, proclaims that if a tender should be made, acceptance would be refused.[46] Furthermore, acts which, in themselves, are insufficient to make a complete tender may constitute proof of readiness to perform, so as to protect the rights of a party under a contract, where a proper tender is rendered impossible by circumstances not due to the fault of the tenderer.[47]

The evidence was undisputed that there were no written certificates of shares Dick could have tendered. Additionally, Koski clearly communicated his opinion that KPG had no duty to purchase under the Shareholder Agreement because Dick had stolen KPG's clients—not because Dick had failed to satisfy any condition precedent under the Shareholder

---

[42] See *id.*, §§ 38:8 and 47:1.

[43] *Caha v. Nelson*, 195 Neb. 333, 237 N.W.2d 870 (1976).

[44] See *Cox v. Cox*, 124 Neb. 706, 247 N.W. 898 (1933).

[45] See *id.*

[46] See *Canaday v. Krueger*, 156 Neb. 287, 56 N.W.2d 123 (1952).

[47] *Cox v. Cox, supra* note 44.

Agreement. Koski's blanket refusal to acknowledge any duty to purchase under the Shareholder Agreement clearly communicated that any tender by Dick would be futile. To the extent Koski spoke for KPG, this proclamation was a waiver of tender.[48]

Regardless, Dick was obligated only to make an offer of tender that was conditional upon KPG's contemporaneous performance. Undisputed facts in the record demonstrate that Dick made such an offer of tender to Koski as a representative of KPG, but KPG never performed. Dick manifested that he was ready and willing to perform his obligations under the buyout provisions of the Shareholder Agreement. At that time, some of Dick's shares were encumbered by a debt to Koski, but there is no evidence that Dick was unable to pay the remainder owed on the loan. Further, until KPG communicated whether KPG would be reducing the purchase price by offsetting Dick's indebtedness to Koski under the provision for "Shareholder Indebtedness to be Offset," Dick could not know whether he was required to pay the balance of the loan directly to Koski before closing.

There was no basis under these facts to instruct the jury on the affirmative defense of failure to satisfy a condition precedent.

(b) Prior Material Breaches of Covenant of
Good Faith and Fair Dealing
and Fiduciary Duty

We also find no reversible error based on the court's refusal to instruct the jury on affirmative defenses of prior material breaches of fiduciary duty or breaches of the covenant of good faith and fair dealing.

First, KPG did not allege that a prior breach of fiduciary duty or good faith and fair dealing operated as an affirmative defense to Dick's breach of contract claim. And a party may not complain of the failure of the trial court to instruct on

---

[48] See *Canaday v. Krueger, supra* note 46.

issues that are outside the scope of the pleadings.[49] The court's refusal to instruct on these matters can be affirmed for that reason alone.

[28,29] We also note that the instructions were not warranted. To constitute a defense to an action based on contract, the matters must generally be germane to the cause of action pleaded, in addition to presenting a legal reason why the plaintiff will not recover.[50] A claim of defense arising out of tort concepts is not generally available where the claim of plaintiff is premised upon contract.[51]

As the district court noted in denying instructions on prior material breach of fiduciary duty or good faith and fair dealing, "the object of the agreement is what has [been] breached" in the case law excusing performance. Here, there was no relation between the duties set forth in the Shareholder Agreement regarding the repurchase of stock and the acts KPG alleged constituted breaches of fiduciary duty and good faith and fair dealing.

[30] Fiduciary duties arise from the relationship and not from the terms of the agreement.[52] Thus, while a breach of fiduciary duty may form the basis of a counterclaim, it is not ordinarily an affirmative defense to a claim for a breach of contract.[53]

It is true that breaches of fiduciary duty can, in certain circumstances, be grounds for alleging that a contract is void.[54] For example, a corporate officer's or director's right to compensation can be forfeited through a breach of fiduciary duty to the corporation, and thus provide a defense to an action by

---

[49] *Deck v. Sherlock, supra* note 5.

[50] 17A C.J.S. *Contracts* § 859 (2011).

[51] See *id.*

[52] See *Top of Iowa Co-op. v. Schewe*, 149 F. Supp. 2d 709 (N.D. Iowa 2001).

[53] See *Anderson v. Burton Associates, Ltd.*, 218 Ill. App. 3d 261, 578 N.E.2d 199, 161 Ill. Dec. 72 (1991).

[54] 17B C.J.S., *supra* note 33.

the agent against the principal for compensation for services.[55] But we can find no support for the proposition that a breach of an officer and shareholder's general fiduciary duty to a corporation is an affirmative defense to a claim for breach of performance of a buyout provision in a shareholder agreement.

The case of *Anderson v. Burton Associates, Ltd.*,[56] is instructive. The plaintiff in *Anderson* brought suit to have his stock redeemed under a shareholder agreement for an accounting firm, and the court rejected the alleged affirmative defense of breach of fiduciary duty. The court noted that the defendant did not challenge the existence of sufficient consideration or assert that the plaintiff did not pay for his shares. The court held that whether the plaintiff had breached a fiduciary duty to the corporation by soliciting clients would not defeat his right to his money under the stock redemption provision of the shareholder agreement.[57] The court in the instant case correctly concluded that an instruction on the affirmative defense of breach of fiduciary duty was not warranted, because Dick's acts that KPG takes issue with bore no relation to the buyout provisions under which Dick brought suit against KPG.

[31,32] As for the implied covenant of good faith and fair dealing, KPG is correct that it exists in every contract and

---

[55] See, e.g., *Wadsworth v. Adams*, 138 U.S. 380, 11 S. Ct. 303, 34 L. Ed. 984 (1891); *Wilshire Oil Company of Texas v. Riffe*, 406 F.2d 1061 (10th Cir. 1969); *Flint River Pecan Co. v. Fry*, 29 F.2d 457 (5th Cir. 1928); *Backus v. Finkelstein*, 23 F.2d 357 (D. Minn. 1927); *T.A. Pelsue Co. v. Grand Enterprises, Inc.*, 782 F. Supp. 1476 (D. Colo. 1991); *Kassab v. Ragnar Benson, Inc.*, 254 F. Supp. 830 (W.D. Pa. 1966); *Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320 (1983); *Toy v. Lapeer Farmers Mut. Fire Ins. Ass'n*, 297 Mich. 188, 297 N.W. 230 (1941); *Venie v. Harriet State Bank of Minneapolis*, 146 Minn. 142, 178 N.W. 170 (1920); *American Timber & Trading Co. v. Niedermeyer*, 276 Or. 1135, 558 P.2d 1211 (1976); *Ranch Hand Foods v. Polar Pak Foods, Inc.*, 690 S.W.2d 437 (Mo. App. 1985) (applying Kansas law). See, also, 2 Restatement (Second) of Agency § 469 (1958).

[56] *Anderson v. Burton Associates, Ltd., supra* note 53.

[57] See *id.*

requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract.[58] However, KPG overlooks the fact that the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.

[33] "The law does not allow the implied covenant of good faith and fair dealing to be an everflowing cornucopia of wished-for legal duties; indeed, the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms."[59] Instead, a violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract.[60] Similarly to the alleged breach of fiduciary duty, KPG failed to identify any express terms of the Shareholder Agreement tied to the alleged breach of an implied covenant of good faith and fair dealing. An instruction on the affirmative defense of breach of the implied covenant of good faith and fair dealing was not warranted by the evidence.

We find no merit to KPG's arguments that the trial court erred by refusing to instruct on the affirmative defense of breach of either a fiduciary duty or the implied covenant of good faith and fair dealing.

### (c) Prior Material Breach of Bylaws

KPG tendered the instruction that a breach of the bylaws in force at the time of purchase of stock in a corporation can constitute a material breach excusing the nonbreaching party from performance under the Shareholder Agreement. A material breach was defined in the tendered instruction as "something that is so fundamental to a contract that the failure to

---

[58] *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014).

[59] *Comprehensive Care Corp. v. RehabCare*, 98 F.3d 1063, 1066 (8th Cir. 1996).

[60] *Coffey v. Planet Group, supra* note 58.

perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." The tendered instruction directed that if the jury found a material breach of the contract, it "must find that KPG is excused from performance under the Shareholder Agreement."

Additionally, KPG tendered the following instruction:

The management and internal affairs of a voluntary association are governed by its constitution and bylaws, which constitute a contract between the members of the association. The members of a corporation are as a general rule conclusively presumed to have knowledge of its bylaws and cannot escape a liability arising thereunder, or otherwise avoid their operation, on a plea of ignorance of them. This is also true of directors and other officers of the corporation. Bylaws ordinarily are binding on the shareholders or members whether they expressly consent to them or not. Bylaws in force at the time of a purchase of stock in a corporation form part of the contract between the corporation and its shareholders. The corporate articles, bylaws, and the shareholder agreement must be read together.

KPG then tendered a special verdict form for the jury to set forth whether, in regard to Dick's complaint against KPG, KPG had met its burden to show by the greater weight of the evidence that Dick "committed a prior material breach of the Shareholder Agreement."

KPG's theory for these instructions was that Dick had breached the provision of the bylaws stating that "[a]ll officers, agents, and employees of [KPG] shall be required . . . to maintain and preserve confidentiality as to all business techniques, commercial data, formulas, good will, operational methods, product identifications, [etc.]" KPG asserted that the disclosure of the information on the spreadsheet emailed to Bland violated this provision—though KPG has never made its theory entirely clear as to which of the specified items Dick failed

to maintain and preserve the confidentiality of. KPG believed that such a breach of the bylaws excused its failure to perform under the buyout provisions of the Shareholder Agreement.

[34] The "prior material breach" doctrine upon which KPG relies applies when a contract contemplates an exchange of performances between the parties, and the doctrine holds that one party's failure to perform allows the other party to cease its own performance. In order to constitute a possible prior material breach, the obligation upon which a plaintiff has sued in the breach of contract claim must have been dependent upon the other thing that the plaintiff was to do and failed to do.[61] In other words, prior material breach is

> based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties . . . if there has already been an uncured material failure of performance by the other party.[62]

[35,36] "A duty under a separate contract is not affected . . . , nor is a duty under the same contract affected if it was not one to render a performance to be exchanged under an exchange of promises . . . . Furthermore, only duties to render performance are affected."[63] And the contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense that applies only when the breaching party breaches the same contract on which he or she is suing.[64]

KPG provides law in support of the idea that corporate bylaws constitute a contract between the shareholders. We agree that, broadly speaking, bylaws are also shareholders'

---

[61] *Eager v. Berke*, 11 Ill. 2d 50, 142 N.E.2d 36 (1957).

[62] 2 Restatement (Second) of Contracts § 237 comment *b*. at 217 (1981).

[63] See *id.*, comment *e*. at 221.

[64] *Blackstone Medical v. Phoenix Surgicals*, 470 S.W.3d 636 (Tex. App. 2015).

agreements.[65] And we agree with KPG that the Randall K. Koski, P.C., bylaws appear to be the bylaws of KPG, as the amendment to the articles of incorporation effected a name change for the corporation. We thus deny as moot KPG's motion for this court to take judicial notice of allegations made by Dick in a separate suit, in which Dick allegedly acknowledged that the Randall K. Koski, P.C., bylaws governed KPG.

KPG fails, though, to support its assertion that the Randall K. Koski, P.C., bylaws are part of the Shareholder Agreement under which Dick brought his breach of contract claim. We disagree with KPG's claim that the bylaws and Shareholder Agreement should be read together for purposes of determining the applicability of the doctrine of prior material breach.

[37] Shareholder agreements may be freestanding of corporate bylaws.[66] The Randall K. Koski, P.C., bylaws did not purport to incorporate the Shareholder Agreement. Nor did the Shareholder Agreement incorporate the Randall K. Koski, P.C., bylaws. To the contrary, the Shareholder Agreement provided that it "contains the entire understanding among the parties and supersedes any prior understanding among the parties and agreements between them respecting the within subject matter." The Shareholder Agreement stated further that there were "no representations, agreements, arrangements or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein."

Under the express terms of the Shareholder Agreement, it was freestanding. The promise in the bylaws relating to maintaining confidentiality of items such as "commercial data" and "good will" was an independent promise that bore no relationship to the mutual promises of the buyout provisions of the Shareholder Agreement. Thus, the prior material breach

---

[65] 18A Am. Jur. 2d *Corporations* § 254 (2015).

[66] 1 F. Hodge O'Neal & Robert B. Thompson, O'Neal's Close Corporation and LLCs: Law and Practice § 4:33 (rev. 3d ed. 2018).

doctrine, based on Dick's alleged breach of the confidentiality provision of the bylaws, was inapplicable as an affirmative defense to Dick's claim that KPG breached the buyout provisions of the Shareholder Agreement.

[38] We also note that the jury found against KPG in its counterclaim for breach of the bylaws. Factual issues necessarily determined by a jury's verdict on one claim in a case are also deemed resolved with respect to other claims in the same case.[67] And, as we will explain, we find no merit to KPG's contention that the jury rejected its breach of bylaws claim because it was improperly instructed on the definition of confidential information.

KPG was not prejudiced by the district court's refusal to instruct on prior material breach as an affirmative defense to Dick's breach of contract claim.

### 3. KPG's Counterclaim Against Dick for Breach of Fiduciary Duty (Assignments of Error Nos. 2 Through 4 and 9 Through 15)

We turn next to KPG's assignments of error relating to the jury's verdict against KPG in its counterclaim for breach of fiduciary duty.

KPG asserts that the court erred by failing to grant its motion for directed verdict on this counterclaim. KPG asserts that the undisputed evidence of Dick's (1) use of his wife's email to communicate with Bland to avoid KPG's discovering his negotiations with Bland, (2) meeting with Bland without informing KPG, (3) sharing with Bland certain billing information, and (4) accepting from Bland a 10-percent commission on new clients brought to Bland by Dick were all transactions that shifted the burden to Dick to demonstrate good faith. KPG then asserts that there was no evidence presented

---

[67] See *Lindsay Internat. Sales & Serv. v. Wegener*, 301 Neb. 1, 917 N.W.2d 133 (2018). See, also, e.g., *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373 (Mo. App. 2000).

by Dick that he acted in good faith and that thus, as a matter
of law, before his resignation, Dick breached his fiduciary
duties as both a vice president and a shareholder of KPG and
the district court erred in failing to grant KPG's motion for
directed verdict.

In the event we disagree with KPG's contention that the dis-
trict court should have granted its motion for a directed verdict
on its counterclaim against Dick for breach of fiduciary duty,
KPG asserts that we should reverse the decision and remand
the cause for a new trial because of several alleged trial errors.

First, KPG asserts that the district court erred by failing to
instruct the jury on the same burden shifting that KPG believes
justified a directed verdict.

Second, KPG asserts it was prejudiced by the trial court's
instructions that the breach of fiduciary duty claim was based
only on the purported breach of bylaws and Dick's failure to
send engagement letters to KPG clients before resigning.

Third, KPG asserts that it was prejudiced by the court's
exclusion of Dick's breach of an allegedly ongoing, postresig-
nation fiduciary duty by virtue of Dick's continuing status as
a shareholder, and, relatedly, by instructing that the fiduciary
duty ends upon the termination of the employment relationship.
To the extent the court precluded KPG from litigating a claim
based on postresignation conduct because it was not pleaded,
KPG argues that the court erred in its reading of the operative
pleading and, alternatively, that the court abused its discretion
in denying KPG's motion to amend.

Finally, KPG argues it was prejudiced by the court's refusal
to instruct the jury on the corporate opportunity doctrine and
equitable clawback damages.

[39-41] The existence of a fiduciary duty and scope of that
duty are questions of law for the court to decide.[68] The law of
trusts forms the basis for fiduciary duties. Fiduciaries in

---

[68] *Strohmyer v. Papillion Family Medicine*, 296 Neb. 884, 896 N.W.2d 612
(2017).

a corporation are not trustees in the strict sense because they do not have title to the estate; they are instead fiduciaries to the extent that they control the corporation's property.[69] The scope of fiduciary duties is flexible, reflecting the historical approach of the courts of equity.[70]

[42-44] The traditional rule has been that corporate shareholders do not owe one another a fiduciary duty; rather, corporate officers and directors owe shareholders such a duty.[71] Exceptions have been found for majority shareholders of closely held corporations.[72] Minority shareholders do not generally owe a fiduciary duty to each other or to the corporation,[73] but some cases have imposed a fiduciary duty on a minority shareholder in a close corporation who has control over corporate actions.[74] An officer of a corporation occupies a fiduciary relationship toward the corporation and its stockholders.[75] The existence of a fiduciary duty of an officer in a closely held corporation depends on the ability to exercise the status that creates it, and nominal corporate officers with no management authority generally do not owe fiduciary duties to the corporation.[76] Dick does not dispute that he was more

---

[69] See John R. Van Winkle & Gary R. Welsh, *Origin, Development, and Current Status of Fiduciary Duties in Close Corporations: Has Indiana Adopted a Strict Good Faith Standard?*, 26 Ind. L. Rev. 1215 (1993).

[70] See 2 Robert B. Thompson, O'Neal and Thompson's Oppression of Minority Shareholders and LLC Members § 7:3 (2009 & Supp. 2020).

[71] Annot., 39 A.L.R.6th 1 (2008).

[72] *Id.*; 3 William Wilson Cook, Treatise on the Law of Corporations Having a Capital Stock § 14:16 (3d ed. 2010 & Supp. 2019).

[73] See N.C. Corp. Law and Prac. § 18:27 (West 4th ed. 2019).

[74] See 3 Cook, *supra* note 72.

[75] See *Rettinger v. Pierpont*, 145 Neb. 161, 15 N.W.2d 393 (1944). See, also, e.g., 2 Thompson, *supra* note 70.

[76] *Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642, 748 N.W.2d 626 (2008); Edwin W. Hecker, Jr., *Fiduciary Duties in Business Entities Revisited*, 61 U. Kan. L. Rev. 923 (2013).

than a nominal corporate officer, though the extent to which he controlled KPG was unclear. Dick concedes he owed KPG a fiduciary duty prior to his resignation.

### (a) Burden Shifting: Directed Verdict and Instructions

[45] The plaintiff in an action for breach of fiduciary duty has the burden to prove that (1) the defendant owed the plaintiff a fiduciary duty, (2) the defendant breached the duty, (3) the defendant's breach was the cause of the injury to the plaintiff, and (4) the plaintiff was damaged.[77] In the law of trusts, while the beneficiary has the initial burden of proving the existence of the fiduciary duty and the trustee's failure to perform it, once the trust beneficiary has established a prima facie case by demonstrating the trustee's breach of fiduciary duty, the burden of explanation or justification shifts to the fiduciaries.[78]

[46] In an action for breach of fiduciary duty toward a corporation, the plaintiff must establish a prima facie case of both the existence of a fiduciary duty and its breach before the burden shifts to the defendant to prove the defendant acted in an open, fair, and honest manner such that no breach of fiduciary duty occurred.[79] Only once a plaintiff demonstrates a breach of the duty of care does the burden shift to the fiduciary to prove that, notwithstanding the breach, the challenged transaction was entirely fair.[80]

It has been described that only the burden of production shifts, not the burden of proof, otherwise known as the burden

---

[77] See *McFadden Ranch v. McFadden*, 19 Neb. App. 366, 807 N.W.2d 785 (2011).

[78] 76 Am. Jur. 2d *Trusts* § 618 (2016 & Supp. 2020).

[79] See, e.g., *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir. 1984); *Collier v. Bryant*, 216 N.C. App. 419, 719 S.E.2d 70 (2011).

[80] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993).

of persuasion.[81] In any event, there is with certain transactions, once proved, a presumption that the fiduciary acted in self-interest, which shifts the burden to the fiduciary to show that he or she did not obtain secret profits and that the transaction was conducted fairly, honestly, and openly.[82] However, for the burden to be placed on the fiduciary, the plaintiff must prove that the fiduciary engaged in a transaction with the principal that gives rise to the presumption of unfairness.[83] Contrary to KPG's assertion, the mere allegation of such a transaction is not enough.[84]

KPG points out that we have said the burden of proof is upon a party holding a confidential or fiduciary relation to establish the perfect fairness, adequacy, and equity of a transaction with the party with whom he holds such relation.[85] Thus, for instance, we have held that it is the burden of an officer, who sets his or her own salary, to prove that such salary is reasonable.[86] But that is a transaction with the party with whom the officer holds a fiduciary relationship.[87] Here, the "transaction" at issue was not with KPG, but with Bland.

Typically, a transaction with a third party that shifts the burden to the fiduciary is one of self-dealing—a factual situation in which a corporate fiduciary appears on both sides of a contract or transaction with the fiduciary's corporation.[88] Because

---

[81] See Charles M. Yablon, *On the Allocation of Burdens of Proof in Corporate Law: An Essay on Fairness and Fuzzy Sets*, 13 Cardozo L. Rev. 497 (1991).

[82] *Simpson v. Spellman*, 522 S.W.2d 615 (Mo. App. 1975).

[83] *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277 (5th Cir. 2007).

[84] 1 Roger J. Magnuson, Shareholder Litigation § 10:20 (2012 & Supp. 2020).

[85] See *Evans v. Engelhardt*, 246 Neb. 323, 518 N.W.2d 648 (1994). See, also, e.g., *Rettinger v. Pierpont, supra* note 75.

[86] *Evans v. Engelhardt, supra* note 85.

[87] See *id*. See, also, e.g., *Rettinger v. Pierpont, supra* note 75.

[88] See *Sinclair Oil Corporation v. Levien*, 280 A.2d 717 (Del. 1971).

the business judgment rule is a rebuttable presumption, it places an initial burden on the party challenging a corporate decision to demonstrate the decisionmaker's self-dealing or other disabling factor; and if a challenger sustains that initial burden, then the presumption of the rule is rebutted, and the burden of proof shifts to the defendants to show that the transaction was, in fact, fair to the company.[89]

For example, in *Anderson v. Clemens Mobile Homes*,[90] the plaintiff proved that an officer had realized a personal profit on the sale of land and business ventures financed with corporate funds, and we held it was the officer's burden to prove by a preponderance of the evidence that he did so in good faith and did not act in such a manner as to cause or contribute to the injury or damage of the corporation, or deprive it of business.[91] Likewise, in *Sadler v. Jorad, Inc.*,[92] we shifted the burden to the defendant majority shareholders to establish fairness and reasonableness where the plaintiff had proved that they had withdrawn excess salaries and distributions from the corporation. In these cases applying burden shifting, which were accounting actions, we noted that ordinarily the burden would be entirely on the plaintiff, but that it would be unfair to impose such a burden when the defendants had control of the books and managed the business.[93]

[47] As the district court noted, negotiating to leave one's fiduciary position with a closely held corporation and to enter into competing employment elsewhere is not a transaction that shifts the burden to the fiduciary to prove the negotiation's fairness. It is not, standing alone, a violation of fiduciary

---

[89] 19 Am. Jur. 2d *Corporations* § 2104 (2015).

[90] *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983).

[91] See, also, e.g., *Qualsett v. Abrahams*, 23 Neb. App. 958, 879 N.W.2d 392 (2016).

[92] *Sadler v. Jorad, Inc.*, 268 Neb. 60, 680 N.W.2d 165 (2004).

[93] See, *id.*; *Anderson v. Clemens Mobile Homes, supra* note 90.

duty.[94] This is true regardless of whether the fiduciary in question was a shareholder and officer.[95] Indeed, KPG does not challenge the court's instruction that employees, including employees with fiduciary duties, may plan and prepare for their competing business while still employed without breaching the duty of loyalty and that employees are allowed to discuss job offers that would involve engaging in future competition with their current employer without incurring liability.

[48] It is well settled that "'[a]n employer's right to demand and receive loyalty must be tempered by society's legitimate interest in encouraging competition.'"[96] An at-will employee with a fiduciary relationship with his or her employer may properly plan to go into competition with the employer and may take active steps to do so while still employed, and such an employee has no general duty to disclose such plans to the employer.[97] According to the Restatement (Third) of Agency:

> In general, an employee or other agent who plans to compete with the principal does not have a duty to disclose this fact to the principal. To be sure, the fact that an agent has such a plan is information that a principal would find useful, but the agent's fiduciary duty to the principal does not oblige the agent to make such disclosure. . . . In this respect, the social benefits of furthering competition outweigh the principal's interest in full disclosure by its agents.[98]

---

[94] 2 Restatement (Third) of Agency § 8.04, comment *c*. (2006).

[95] See, e.g., *Bancroft-Whitney Co. v. Glen*, 64 Cal. 2d 327, 411 P.2d 921, 49 Cal. Rptr. 825 (1966); 2 Restatement (Third), *supra* note 94; 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 856 (2008); 8 Illinois Practice Series, Business Organizations § 14:17 (2d ed. 2010); Christopher Lyle McIlwain, *Backstab: Competing With the Departing Employee*, 29 Cumb. L. Rev. 615 (1999).

[96] *Navigant Consulting, Inc. v. Wilkinson, supra* note 83, 508 F.3d at 284. Accord *Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 565 N.E.2d 415 (1991).

[97] *Id.*

[98] 2 Restatement (Third), *supra* note 94 at 306.

Thus, the fact that Dick used his wife's email to communicate with Bland and met with other Bland shareholders without telling anyone at KPG was not, as KPG contends, a breach of Dick's fiduciary duty as a matter of law.

KPG relies on statements made in *Bode v. Prettyman*[99] and *I. P. Homeowners v. Radtke*[100] that partners must not "take advantage" of one another "by the slightest concealment or misrepresentation of any kind."[101] This statement is taken out of context and ignores that part of the proposition referring to taking advantage of one another. Certainly, there were many things that Dick may have "concealed" from KPG but which KPG had no right to know. Dick's intention to leave his employment at KPG was one such thing, and Dick did not "take advantage" of KPG by concealing those plans. As the district court noted in relation to its instructions, "even a fiduciary . . . has the right to do certain things. He isn't blindly loyal, and he doesn't have to disclose everything in the world to his partners . . . ."

[49] There are, of course, limitations on the conduct of an employee who plans to compete with an employer: The employee may not (1) appropriate the employer's trade secrets, (2) solicit the employer's customers while still working for the employer, (3) solicit the departure of other employees while still working for the employer, or (4) carry away confidential information, such as customer lists.[102] The district court correctly instructed:

> While planning and preparing for a competing business is permissible, an employee may not act in direct competition with his or her employer while still employed. Factors showing that an employee acted in direct competition

---

[99] *Bode v. Prettyman*, 149 Neb. 179, 30 N.W.2d 627 (1948), *modified* 149 Neb. 469, 31 N.W.2d 429.

[100] *I. P. Homeowners v. Radtke*, 5 Neb. App. 271, 558 N.W.2d 582 (1997).

[101] *Bode v. Prettyman, supra* note 99, 149 Neb. at 188, 30 N.W.2d at 632.

[102] See *Navigant Consulting, Inc. v. Wilkinson, supra* note 83.

during his or her employment include the following: use of confidential and trade secret information acquired from the employer to compete; soliciting customers and clients to join the competing business before the end of the employment relationship; or committing some other fraudulent or unlawful act aimed at destroying the employer's business. To give rise to liability, the alleged disloyal acts must substantially hinder the employer in the continuation of its business.

Neither party takes issue with this instruction.

But such improper conduct in the pursuit of new employment is not the kind of "transaction" that results in burden shifting. Indeed, in such circumstances, there would be no need to shift the burden to show that the "transaction" complied with the business judgment rule or was otherwise fair to the corporation. They are acts that, if proved, are inherently against the corporation's interests.

The jury was presented with evidence that Dick shared with Bland certain billing information and then profited from that by being offered and accepting from Bland employment that included a 10-percent commission on new clients. The jury could have found that such acts constituted breaches of Dick's fiduciary duty. It ultimately determined that they did not. However, these acts did not shift the burden to Dick to show they were done fairly.

There is no merit to KPG's argument that the court should have granted KPG's motion for directed verdict based on Dick's alleged failure to satisfy his alleged burden to prove good faith in his (1) use of his wife's email to communicate with Bland to avoid KPG's discovering his negotiations with Bland, (2) meeting with Bland without informing KPG, (3) sharing with Bland certain billing information, and (4) accepting from Bland a 10-percent commission on new clients brought to Bland by Dick.

Likewise, the jury's verdict is not called into question because the court refused to give KPG's proposed instruction

on burden shifting in relation to these acts. KPG's proposed instruction stated in relevant part:

> Once evidence was presented by KPG that certain transactions existed that allegedly breached . . . Dick's fiduciary duty, the burden shifted to . . . Dick to prove the fairness of the transactions. . . . Dick therefore must prove by a preponderance of the evidence that his actions were taken in good faith and he did not act in such a manner as to cause or contribute to the injury or damage of KPG, or deprive it of business.

This instruction was not warranted by the evidence, because there was no evidence of a burden-shifting transaction, as already discussed.

Furthermore, the proposed instruction is overly broad and is misleading. It fails to define what the "certain transactions" could be. The prior paragraphs of the instruction do not tie directly to the "certain transactions" and are themselves overly broad by stating that the fiduciary "must at all times act for the common benefit of all" and "must not take advantage of a partner by the slightest concealment or misrepresentation of any kind"—again, a point already discussed. Lastly, KPG's proposed instruction portrays as a foregone conclusion that Dick engaged in those "certain transactions" inasmuch as it stated, without condition, that Dick "must prove" that his actions were taken in good faith.

We find no merit to KPG's assertion that the district court either should have granted its motion for directed verdict on its claim for breach of fiduciary duty or should have given its proposed instructions on burden shifting.

### (b) Instruction That Breach Was
### Based on Two Grounds Only

KPG assigned as error the court's instruction that KPG's claim for breach of fiduciary duty was based on two grounds only, the violation of KPG's bylaws and Dick's failure to send engagement letters to KPG clients before his resignation.

Instruction No. 9 informed the jury that KPG asserted that Dick breached his fiduciary duty to KPG "in one or more of the following ways: . . . Violat[ing] [KPG's] bylaws by disclosing [KPG's] alleged confidential information to Bland; . . . Fail[ing] to send out an Engagement Letter to [two named entities] in an effort to undermine [KPG's] relationships with clients." KPG asserts that it was prejudiced by this instruction because it had pleaded and offered evidence at trial of Dick's concealment, sharing confidential information with a competitor, and other actions demonstrating a failure to exercise the utmost good faith.

KPG did not argue this assignment of error in the argument section of its brief. Errors that are assigned but not argued will not be addressed by an appellate court.[103]

For the sake of completeness, however, we also point out that we have concluded that the concealment of negotiations for new employment, upon which KPG based its claims, was not actionable. And there were many instructions that touched upon other aspects of KPG's claim for breach of fiduciary duty. These instructions included that Dick had a duty to "always act for the common benefit of all," "deal fairly and honestly with [KPG]," "disclose any conflicts between Dick's interests and [KPG's] interests that might make him act in his own best interests at the expense or [to] the detriment of [KPG]," and not "use . . . confidential [or] trade secret information acquired from [KPG] to compete" during the employment relationship. If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[104] KPG was not prejudiced by the court's instruction No. 9.

---

[103] *Livingston v. Metropolitan Util. Dist.*, 269 Neb. 301, 692 N.W.2d 475 (2005).

[104] *InterCall, Inc. v. Egenera, Inc., supra* note 7.

(c) Conduct After Departure

Next, KPG asserts that it was prejudiced by the district court's order excluding evidence of Dick's postresignation breach. Relatedly, KPG asserts that the court erred by instructing on what KPG describes as "the lesser duty of loyalty, not fiduciary duty,"[105] which was an instruction stating that "fiduciary duty ends upon termination of the employment relationship." KPG argues we should remand the cause for a new trial wherein it can offer evidence and argument related to Dick's alleged breach of fiduciary duty to KPG through Dick's postresignation conduct. KPG presumes that because KPG did not buy back Dick's shares, Dick never stopped owing KPG a fiduciary duty as a shareholder, despite his resignation. KPG also asserts that because the "closing date" of a buyout under the Shareholder Agreement was 60 days after the operative event of Dick's departure, Dick would owe a postresignation fiduciary duty "for up to 60 days after resignation," even if KPG had bought back Dick's shares.[106] We find no merit to KPG's assignments of error relating to Dick's postresignation conduct.

The court excluded evidence of Dick's postresignation conduct on the ground that KPG did not plead such conduct sufficiently to put Dick on notice that it would be the subject of litigation. KPG points out that in the "Introduction" section of its amended counterclaim, KPG referred to how "immediately after Dick's departure," Dick "used KPG's confidential business techniques and commercial data to raid KPG's client base and take over KPG's niche practice." KPG had also alleged under the "Background Facts" section of its counterclaim that "Dick has solicited current KPG clients by using his knowledge of KPG's confidential business techniques and commercial data to attempt to underbid KPG's services for KPG's existing clients and co-opt the niche developed by

---

[105] Brief for appellant at 31.

[106] *Id.* at 28.

KPG." Finally, KPG further alleged under the "Background Facts" section of its amended third-party complaint that Dick "instructed former KPG clients not to pay outstanding invoices issued by KPG," after Dick's departure. But, as the district court noted, while KPG carefully set forth in its amended counterclaim numerous specific allegations as to how Dick had breached his fiduciary duty, KPG did not therein allege any postresignation conduct. Under the circumstances, we find no error in the court's conclusion that KPG had not given Dick notice that its claim of breach of fiduciary duty was based on postresignation conduct.

We also find that the district court did not abuse its discretion in denying KPG's request for leave to amend the pleadings. KPG did not move to amend until well into trial.

Moreover, the specific allegations of postresignation conduct that KPG relies on in its amended counterclaim relate to the alleged use of confidential information and tortious interference with a business relationship. And these claims were presented to and rejected by the jury. They are in effect the same acts presented to the jury with regard to Dick's preresignation conduct. We cannot conclude that the jury would have viewed these allegations differently if presented with the fact that Dick continued these acts after his resignation.

[50] To the extent any other acts would have been presented to the jury but for the court's order excluding postresignation conduct, the substance of such evidence was not presented through an offer of proof and it is not apparent from the context. Neb. Rev. Stat. § 27-103(1) (Reissue 2016) provides in relevant part that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected," and that "[i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked." Error may not be predicated upon a ruling of a trial court excluding testimony of a witness unless the substance of the evidence to be offered

by the testimony was made known to the trial judge by offer or was apparent from the context within which the questions were asked.[107]

Having found no merit to the contention that the court erred in excluding postresignation conduct, we also conclude that the evidence failed to warrant an instruction on postresignation conduct.

Furthermore, we find the jury instruction given by the court correctly stated the law and was not misleading, while KPG's proposed instruction would have been misleading. KPG takes issue with that portion of instruction No. 8 stating "[a]n individual's fiduciary duty ends upon termination of the employment relationship." Instruction No. 8 provided in full:

Shareholder employees in a close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another, to act among themselves in the utmost good faith and loyalty.

An individual's fiduciary duty ends upon termination of the employment relationship. Under Nebraska law, every employee, including employees with fiduciary duties, owes his or her employer a duty of loyalty until the employment relationship is terminated. During employment, an employee has a duty not to compete with his employer concerning the subject matter of the employment. However, employees, including employees with fiduciary duties, may plan and prepare for their competing business while still employed without breaching the duty of loyalty. Employees, including employees with fiduciary duties, are allowed to discuss job offers, while still employed, to engage in future competition with their employer without incurring liability.

---

[107] *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998). See, also, *Intercall, Inc. v. Egenera, Inc., supra* note 7; *Sherman County Bank v. Kallhoff*, 205 Neb. 392, 288 N.W.2d 24 (1980).

While planning and preparing for a competing business is permissible, an employee may not act in direct competition with his or her employer while still employed. Factors showing that an employee acted in direct competition during his or her employment include the following: use of confidential and trade secret information acquired from the employer to compete; soliciting customers and clients to join the competing business before the end of the employment relationship; or committing some other fraudulent or unlawful act aimed at destroying the employer's business. To give rise to liability, the alleged disloyal acts must substantially hinder the employer in the continuation of its business.

The court refused to give the jury KPG's proposed instruction, which stated:

Generally, a shareholder's fiduciary duty continues after he resigns as an officer, director, or employee of a close corporation. Resignation by a shareholder from the position of officer and director does not relieve that person of a fiduciary duty to the fellow shareholders because the resignation does not change that person's status as a shareholder in the close corporation.

In arguing that it was prejudiced by instruction No. 8 and the court's refusal to give its proposed instruction on postresignation duty, KPG relies on Neb. Rev. Stat. § 67-424 (Reissue 2018) of the Uniform Partnership Act of 1998,[108] which sets forth a duty to refrain from competing with the partnership until final dissolution.[109] KPG connects this to our case law in which we have said that shareholders in a close corporation owe one another the same fiduciary duty as that owed by one partner to another in a partnership.[110] KPG then extrapolates that Dick still owes to this day a fiduciary duty to

---

[108] Neb. Rev. Stat. §§ 67-401 to 67-467 (Reissue 2018).

[109] See *Bellino v. McGrath North*, 274 Neb. 130, 738 N.W.2d 434 (2007).

[110] See *id*. See, also, *Anderson v. Bellino*, 265 Neb. 577, 658 N.W.2d 645 (2003).

KPG by virtue of the facts that Dick is still a shareholder and that KPG has not dissolved. Again, the cases upon which KPG relies are inapplicable to the facts of the case at bar.

*Bellino v. McGrath North*[111] was a professional negligence action against a law firm based on advice given in connection with the severance of a business relationship. The client was the president, director, and 50-percent shareholder in a closely held corporation that operated a keno parlor under a lottery operation contract with the city. On his counsel's advice, the president tendered his resignation as officer and director effective upon termination of the city contract. Then, before such termination, and thus before the effective date of his resignation, the president formed a new corporation by himself, through which he won the contract that had been put up for public bidding.

In a separate action, we had affirmed a verdict in favor of the closely held corporation for breach of fiduciary duty, noting that although there was no noncompete agreement, a corporate director may not compete with the corporation if the director's competition causes or contributes to the injury or damage of the corporation, or deprives it of business.[112] In *Bellino v. McGrath North*, we subsequently affirmed a judgment in favor of the corporation's president against the law firm on the ground that it was malpractice to advise the former president that he could avoid liability for usurping a corporate opportunity simply by being up front and honest about it. In the course of so concluding, we said that shareholders in a close corporation owe one another the same fiduciary duty as owed by one partner to another in a partnership and that a partner has a duty to refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.[113]

---

[111] *Bellino v. McGrath North, supra* note 109.

[112] See *Anderson v. Bellino, supra* note 110.

[113] See *Bellino v. McGrath North, supra* note 109.

In the Seventh Circuit case relied on by KPG, *Rexford Rand Corp. v. Ancel*,[114] the court held that a minority shareholder violated his fiduciary duty to a closely held corporation by secretly reserving the corporation's trade names when they became available, after an unintentional administrative dissolution of the corporation and a "freeze out" deprived the minority shareholder of his position and the benefit of stock ownership. The court reasoned that the minority shareholder had taken it upon himself to retaliate, which violated his continuing fiduciary duty—as he was technically still a shareholder—to refrain from conduct intended to be detrimental to the enterprise.[115] The court found it to be bad policy for frozen-out shareholders to attempt to resolve disputes in this manner rather than seek a judicial remedy.[116]

Finally, KPG relies on a case from the appellate court of Illinois, *Hagshenas v. Gaylord*.[117] In *Hagshenas*, a director, vice president, and 50-percent shareholder of a closely held corporation operating a travel agency resigned as vice president and secretary and, the following day, opened a new travel agency and began competing with the corporation, soliciting the corporation's customers, and hiring several travel agents who had been working for the corporation. At the same time, the former vice president did not give up his 50-percent control over the corporation and continued to express an interest as a shareholder in its ongoing affairs. When the other shareholders and the former vice president could not reach an agreement as to the corporation's ongoing operations, the former vice president sued for dissolution, and the other shareholders counterclaimed for breach of fiduciary duty.

---

[114] See *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1220 (7th Cir. 1995).

[115] See *id*.

[116] See *id*.

[117] *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 557 N.E.2d 316, 145 Ill. Dec. 546 (1990).

The court in *Hagshenas* rejected the former vice president's argument that he had ceased to owe a fiduciary duty after his resignation. The court acknowledged that ordinarily an officer or director owes no fiduciary duty to the corporation after resignation and that a mere owner of stock in a company does not owe a fiduciary duty to that company. But the court held that 50-percent shareholders owe a fiduciary duty to each other similar to that of partners. And the former vice president had purposefully maintained his 50-percent shareholder status and control. The court explained that if there were problems that could not be resolved, then the proper course of action would have been to negotiate a sale or buyout of the shares or file for dissolution, and that until a final sale or order of dissolution, the former vice president owed a fiduciary duty to the corporation.[118]

None of these cases involve shareholder agreements with buyout provisions in the express event of a shareholder's departure, much less buyout provisions that contemplate a purchase price dependent upon the number of clients who decide to continue with the departing shareholder at the new place of employment. And none of these cases involve continuing shareholder status by virtue of the corporation's refusal to buy out the shares. Unlike the shareholder in *Hagshenas*, Dick testified that he had no control over KPG's operations after his resignation, and there was no testimony refuting that statement. Unlike the shareholder in *Rexford Rand Corp.*, Dick was not trying to circumvent legal avenues of relief through retaliatory action.[119] He simply changed his place of employment and solicited the clients he had served while at KPG.

We find applicable cases holding that upon termination of employment, a shareholder who is subject to a mandatory buyout is divested of shareholder status immediately, and that any reciprocal fiduciary obligations of the shareholders

---

[118] *Id.*

[119] See *Rexford Rand Corp. v. Ancel, supra* note 114.

no longer exist even if the corporation has not yet redeemed the employee's stock.[120] This is distinct from cases holding in the context of the fiduciary duty of the majority shareholders toward a terminated employee shareholder that the corporation still owes certain duties to the shareholder during the course of an expressly contemplated delay of the buyout or when terminating shareholder status would "unfairly strip a minority shareholder of all sharehholder rights while he [or she] remains the legal owner of the shares."[121] We can find no authority for the proposition that a voluntarily departing shareholder is bound by a general fiduciary duty not to compete with a closely held corporation until the closing date of a mandatory buyout provision—much less that such shareholder is bound by virtue of the corporation's unjustified refusal to perform its buyout obligations until the matter can be resolved through litigation.

While it may be true, as KPG points out, that the departing shareholder can eventually recover or force specific performance through legal action, it would be against public policy to allow the corporation to deprive the departing shareholder of competing employment until such legal actions can be taken. As stated, even corporate officers and directors, who have fiduciary duties to the corporation, are free to resign and go into competition as long as they remain loyal prior to resigning.[122]

We find no reversible error based on either the exclusion of postresignation conduct or the court's refusal to instruct on a postresignation fiduciary duty.

---

[120] See, *Riesett v. W.B. Doner & Co.*, 293 F.3d 164 (4th Cir. 2002); *Gallagher v. Lambert*, 74 N.Y.2d 562, 549 N.E.2d 136, 549 N.Y.S.2d 945 (1989). But see *Jenkins v. Haworth, Inc.*, 572 F. Supp. 591 (W.D. Mich. 1983).

[121] See *Drewitz v. Motorwerks, Inc.*, 706 N.W.2d 773, 785 (Minn. App. 2005), *reversed in part on other grounds* 728 N.W.2d 231 (2007). Accord *Stephenson v. Drever*, 16 Cal. 4th 1167, 947 P.2d 1301, 69 Cal. Rptr. 2d 764 (1997).

[122] *Stuart C. Irby Co., Inc. v. Tipton*, 796 F.3d 918 (8th Cir. 2015).

### (d) Corporate Opportunity Doctrine

Next, KPG argues that it was prejudiced by the district court's refusal to give its proposed instruction on the corporate opportunity doctrine. KPG asserts that the clients Dick served while at KPG were KPG's corporate opportunities.

KPG had proposed that the court instruct:

> A business opportunity may "belong" to a corporation. If a director of the corporation breaches his fiduciary duty to the corporation to usurp that opportunity, the corporation is entitled to recover for that loss. The fact that the proceeds from the usurpation may have ended up in the hands of an innocent party does not defeat the corporation's right to recover from those whose breaches of fiduciary duty occasioned the loss.

This statement is derived from *Trieweiler v. Sears*,[123] in which we considered the defendant directors' formation of a new corporation to open a new location for the bar business the closely held corporation was in the business of operating and which was financed and operated through an intertwining of corporate affairs with the closely held corporation the plaintiff was a shareholder of. We affirmed the district court's finding that the newly formed corporation had usurped a corporate opportunity.[124]

We described that the doctrine of corporate opportunity prohibits one who occupies a fiduciary relationship to a corporation from acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence.[125] The traditional remedy imposed by courts upon a finding of a misappropriation of a corporate opportunity is the equitable impression of a constructive trust in favor of the corporation upon the property. We explained that a party seeking to establish the trust must

---

[123] *Trieweiler v. Sears*, 268 Neb. 952, 689 N.W.2d 807 (2004).

[124] See *id.*

[125] See *id.*

prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.[126] We rejected the argument that the percentage of the proceeds of the corporate opportunity distributed to an innocent investor defeated the corporation's right to recover from those whose breaches of fiduciary duty occasioned the loss, holding that

> the fact that a director stole valuable assets from a corporation and gave those assets to a presumably innocent third party does not change the fact that the assets properly belonged to the corporation in the first place and that the corporation should be compensated for the theft by the wrongdoer.[127]

[51] It was undisputed that Dick did not solicit any clients until after his resignation, and we have already addressed that such postresignation conduct does not breach a fiduciary duty. More specifically to the doctrine of misappropriation of a corporate opportunity with regard to postresignation conduct, at least one jurisdiction has explained that whether the opportunity rightfully belonged to the corporation is evaluated under an interest or expectancy test.[128] And a past relationship with customers alone is insufficient to create a reasonable expectancy absent a continuing contractual agreement.[129] Customers without exclusive contractual arrangements with corporations or with whom a corporation has to annually renew contracts are not corporate business opportunities.[130] Like with a law

---

[126] See *id.*

[127] *Id.* at 986, 689 N.W.2d at 839.

[128] See, *In re Pervis*, 512 B.R. 348 (N.D. Georgia 2014); *Ins. Industry Consultants, LLC v. Alford*, 294 Ga. App. 747, 669 S.E.2d 724 (2008).

[129] See *id.*

[130] See *id.*

firm, absent a contract stating otherwise, an accountant's clients have a right to select who will be their accountant; they are not the accountancy firm's property.[131]

We agree with this reasoning. The evidence was undisputed that KPG clients had, at most, annually renewable contracts. They were not KPG's property. Thus, they could not be misappropriated.

The facts did not warrant KPG's requested instruction on the corporate opportunity doctrine.

### (e) Equitable Clawback

KPG also asserts that it was prejudiced by the district court's refusal to instruct the jury on equitable clawback damages in relation to its counterclaim for breach of fiduciary duty. KPG's proposed instruction stated: "If you find KPG has proven that . . . Dick breached his fiduciary duty to KPG, you may also consider whether KPG is entitled to recover the compensation it paid to . . . Dick during any periods of his breach of fiduciary duty."

KPG derived this instruction from *Neece v. Severa*.[132] The plaintiff in *Neece* was a psychiatrist who had worked as an independent contractor in the office she later left and sued for an accounting, alleging billing failures under their contract. The Court of Appeals quoted the "Restatement" rule on depriving an agent of compensation:

> "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned."[133]

---

[131] See Karen J. Dilibert, *Fifty Ways to Leave Your Law Firm*, 89 Ill. B.J. 323 (2001).

[132] *Neece v. Severa*, 5 Neb. App. 556, 560 N.W.2d 868 (1997).

[133] *Id.* at 563, 560 N.W.2d at 873, quoting 2 Restatement (Second) of Agency, *supra* note 55.

The Court of Appeals did not apply this principle, however, because the plaintiff did not allege the office had willfully breached its contract with her.

[52] Our appellate courts have not otherwise addressed the concept of equitable clawback. Equitable clawback is a restitutionary remedy based on principles of unjust enrichment and the faithless servant doctrine.[134] The doctrine establishes a mandate that an agent who engages in activities that breach the agent's fiduciary duties to the principal is not entitled to and must forfeit any compensation for services rendered during the period of the breach.[135] The majority of the jurisdictions adopt a bright-line rule that the agent must forfeit all compensation paid or payable over the entire period of the agent's disloyalty, presuming, in effect, that the agent's misconduct tainted or otherwise permeated his or her entire relationship with the principal from the original point of the breach going forward.[136]

Again, the jury was presented with the question of whether Dick breached his fiduciary duty, which the court explained he could do by:

> act[ing] in direct competition with his or her employer while still employed. Factors showing that an employee acted in direct competition during his or her employment include the following: use of confidential and trade secret information acquired from the employer to compete; soliciting customers and clients to join the competing business before the end of the employment relationship; or committing some other fraudulent or unlawful act aimed at destroying the employer's business. To give rise to liability, the alleged disloyal acts must substantially hinder the employer in the continuation of its business.

---

[134] See Manning Gilbert Warren III, *Equitable Clawback: An Essay on Restoration of Executive Compensation*, 12 U. Pa. J. Bus. L. 1135 (2010).

[135] See *id.*

[136] See *id.*

KPG has not challenged on appeal this portion of the instruction.

While the jury was not specifically instructed on equitable clawback damages, KPG's expert witness testified as to the amount of such damages and the jury was given a general verdict form for damages. There was no instruction that negated the possibility of equitable clawback damages.

[53] Any jury instruction is subject to the harmless error rule, which requires a reversal only if error adversely affects the substantial rights of the complaining party.[137] The appellant has the burden of establishing the prejudicial effect.[138] We conclude that KPG has failed to establish it was prejudiced by the district court's refusal to instruct the jury on equitable clawback.

## 4. Breach of Bylaws and Definition of Confidential Information

Turning to its claim against Dick for breach of bylaws, KPG argues it was prejudiced by the court's jury instructions that conflated "trade secret" with "confidential information." Instruction No. 12 set forth:

Confidential information and trade secrets are defined as information including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:

(a) derives economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Confidential

---

[137] See *Plambeck v. Union Pacific RR. Co.*, 232 Neb. 590, 441 N.W.2d 614 (1989).

[138] See *id.*

and trade secret information must have independent economic value. To be considered confidential and trade secret information, possession of the secret information must confer a competitive advantage.

Matters of public knowledge or of general knowledge in an industry are not confidential information or trade secrets; confidential information or a trade secret is something known to only a few and not susceptible of general knowledge. Confidential information and trade secrets must be particular secrets of [KPG] and not the general secrets of the trade in which [KPG] is engaged. If information is ascertainable at all by any means that are not improper, the information is not confidential information or a trade secret.

Instruction No. 13 stated:

If an alleged trade secret or confidential information does not have independent economic value, the information is not entitled to confidential information or trade secret protection under Nebraska law. To be considered confidential and trade secret information, possession of the secret information must confer a competitive advantage.

Information disclosed to customers without any confidentiality requirement, including pricing information, is not confidential information.

KPG fails to delineate what parts of these descriptions of confidential information were inaccurate and misleading. KPG merely insists that not all confidential information constitutes a trade secret and that the bylaws somehow presented something broader.

The "Bylaws of Randall K. Koski, P.C." stated that it shall be required to "maintain and preserve confidentiality as to all business techniques, commercial data, formulas, good will, operational methods, product identifications, service marks, trademarks, trade names, and trade secrets." It does not define those terms. KPG does not identify how these specific concepts relate to its allegations against Dick.

Most notably, the bylaws do not define "confidential information" or "confidentiality." They merely state that the "confidentiality" of the items in the list shall be "preserve[d]" and "maintain[ed]." Logically, to preserve and maintain confidentiality, the information must have been confidential in the first instance. And, on their face, the bylaws do not set forth any new, broader definition of "confidential information" or confidentiality.

As Dick points out, our case law reflects that we have often treated "confidential information" and "trade secrets" interchangeably.[139] There is nothing in the bylaws that convinces us that the court should have presented a different definition than that set forth in jury instructions Nos. 12 and 13.

No conceivable definition of "confidential information" changes the requirement in a breach of contract action that the claimant prove both proximate causation and foreseeable damages of a "kind which naturally follow a breach."[140] Dick argued at trial that the spreadsheet containing the summary of Dick's billings and fees, the types of services he provided, and the states in which he worked was not confidential information because it could be obtained through proper means. The jury either so found or found that it did not confer a competitive advantage or that KPG was not harmed by the disclosure of the information.

We find no merit to KPG's assertion that the verdict in its counterclaim for breach of bylaws should be reversed because of jury instructions that addressed trade secrets and confidential information interchangeably.

---

[139] See, *Gaver v. Schneider's O.K. Tire Co.*, 289 Neb. 491, 856 N.W.2d 121 (2014); *Brockley v. Lozier Corp.*, 241 Neb. 449, 488 N.W.2d 556 (1992); *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 472 N.W.2d 391 (1991); *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986); *Securities Acceptance Corp. v. Brown*, 171 Neb. 701, 107 N.W.2d 540 (1961).

[140] *Birkel v. Hassebrook Farm Serv.*, 219 Neb. 286, 290, 363 N.W.2d 148, 152 (1985).

## 5. KPG's Counterclaim Against Bland for Tortious Interference

As for its counterclaim against Bland for tortious interference, KPG asserts that the district court erred in holding as a matter of law that Bland's payment of commissions to Dick did not violate the rules of professional conduct of the NSBPA and thus excluding KPG's proffered expert opinion that the commissions violated the NSBPA. There was no evidence submitted that the NSBPA itself has determined Bland's commission structure violates its rules of professional conduct or that Bland is under investigation for the same. The jury was presented with the theory that through the 10-percent commission, among other things, Bland had tortiously inferred with KPG's business expectations. Nevertheless, KPG claims it was prejudiced by the exclusion of expert testimony on the alleged NSBPA violation, because, without such testimony, KPG was "required to prove that Dick and Bland committed 'an unjustified intentional act of interference' with KPG's business relationships to prove its claim for tortious interference with a business relationship."[141]

[54] To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted.[142] In order to be actionable, interference with a business relationship must be both intentional and unjustified.[143]

[55] Factors to consider in determining whether interference with a business relationship was unjustified include: (1) the

[141] Brief for appellant at 41.

[142] *Aon Consulting v. Midlands Fin. Benefits, supra* note 76.

[143] See *Recio v. Evers*, 278 Neb. 405, 771 N.W.2d 121 (2009).

nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.[144] The issue is whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.[145]

[56] This determination depends upon a judgment and choice of values in each situation.[146] An individual's interest in prospective economic advantage receives less protection than his or her enforceable contract rights.[147] The rationale for the distinction is that an individual with a prospective business relationship has a mere expectancy of future economic gain, whereas a party to a contract has a certain and enforceable expectation of receiving the benefits of his contract.[148]

Furthermore, in the context of claims of tortious interference with a business relationship or expectancy, we have recognized the privilege of a competitor as described in the Restatement of Torts.[149] "[V]alid competition," including inducement of third persons to do their business with oneself rather than with a particular competitor, "cannot be the

---

[144] *Id.*

[145] *Aon Consulting v. Midlands Fin. Benefits, supra* note 76.

[146] *Id.*

[147] 12 Robert L. Haig, Business and Commercial Litigation in Federal Courts § 121:39 (4th ed. 2016).

[148] *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009). See, also, *Miller Chemical Co., Inc. v. Tams*, 211 Neb. 837, 320 N.W.2d 759 (1982), *disapproved on other grounds, Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991); Restatement of Torts § 768 (1939).

[149] Restatement of Torts, *supra* note 148.

basis for a tortious interference claim," because such conduct is justified.[150]

[57,58] The party alleging tortious interference has the burden of proving that the conduct did not fall within the competitor's privilege.[151] One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if (1) the relation concerns a matter involved in the competition between the actor and the competitor, (2) the actor does not employ improper means, (3) the actor does not intend thereby to create or continue an illegal restraint of competition, and (4) the actor's purpose is at least in part to advance his or her interest in the competition with the other.[152]

[59] KPG argues that offering a commission allegedly in violation of the rules of professional conduct of the NSBPA constitutes improper means of competition; therefore, Bland's interference was unjustified. Improper means of competition has been described as physical violence, fraud, civil suits, and criminal prosecutions—though even these means may not be forbidden, depending upon the relation between the actor and the person induced, and the object sought to be accomplished by the actor.[153]

KPG's only support for the contention that a violation of the rules of professional conduct of the NSBPA constituted improper means is a comment to the Restatement (Second) of Torts dealing with intentional interference with a contract or prospective contractual relation of another:

> *Business ethics and customs.* Violation of recognized ethical codes for a particular area of business activity

---

[150] *Lamar Co. v. City of Fremont, supra* note 148, 278 Neb. at 498, 771 N.W.2d at 906.

[151] See *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483 (8th Cir. 1992).

[152] *Miller Chemical Co., Inc. v. Tams, supra* note 148.

[153] See, 4 Restatement (Second) of Torts § 767, comment on clause (a) (1979); Restatement of Torts, *supra* note 148, comment on clause (b).

or of established customs or practices regarding disap-
proved actions or methods may also be significant in
evaluating the nature of the actor's conduct as a factor in
determining whether his interference with the plaintiff's
contractual relations was improper or not. [154]

This comment was not directly made in relation to the privilege
to compete.

We addressed professional ethics in the context of a claim
for tortious interference with a business expectancy in *Macke
v. Pierce*. [155] We explained that the uncontroverted evidence of
the defendant's breach of his physician's duty of confidentiality
toward his patient did not, standing alone, establish that such
unauthorized disclosure of his patient's medical condition to
her employer constituted tortious interference with a business
expectancy. [156] The physician testified that he had breached the
duty of confidentiality out of concern for the patient's well-
being. We said that this testimony was sufficient to support the
jury's conclusion that the physician had not tortiously inter-
fered with the plaintiff's business expectancy. [157]

In this case, we agree with the district court that the evi-
dence does not support the possible conclusion that Bland
violated the rules of professional conduct of the NSBPA by
offering the 10-percent commission compensation structure to
its employees. Leaving aside whether the compensation struc-
ture at issue constituted a prohibited "commission" under the
NSBPA rules, their plain language prohibits a certified public
accountant from "accepting" certain commissions, which Bland
clearly did not do.

Section 007 of the rules of professional conduct of the
NSBPA provides:

---

[154] 4 Restatement (Second) of Torts, *supra* note 153 at 32.

[155] *Macke v. Pierce*, 266 Neb. 9, 661 N.W.3d 313 (2003).

[156] *Id*.

[157] *Id.*

**007.01 Acts discreditable**. A licensee shall not commit an act that reflects adversely on his fitness to engage in the practice of public accountancy.

**007.02 Commissions and referral fees.**

**007.02A Prohibited Commissions**. *A licensee in public practice shall not* for a commission recommend or refer to a client any product or service, or for a commission recommend or refer any product or service to be supplied by a client, *or receive a commission*, when the licensee or the licensee's firm also performs for that client:

**007.02A1** an audit or review of a financial statement; or

**007.02A2** a compilation of a financial statement when the licensee expects, or reasonably might expect, that a third party will use the financial statement and the licensee's compilation report does not disclose a lack of independence; or

**007.02A3** an examination of prospective financial information.

This prohibition applies during the period in which the licensee is engaged to perform any of the services listed above and the period covered by any historical financial statements involved in such listed services.

**007.02B Disclosure of Permitted Commissions**. A licensee in public practice who is not prohibited by this rule from performing services for or receiving a commission and who is paid or expects to be paid a commission shall provide written disclosure of that fact and the basis for determining such commission to any person or entity to whom the licensee recommends or refers a product or service to which the commission relates.

**007.02C Referral Fees**. Any licensee who accepts a referral fee for recommending or referring any service of a CPA to any person or entity or who pays a referral fee to obtain a client shall provide written disclosure of

such acceptance or payment and the basis for determining such fee to the client.

**007.02D Written Disclosure Statements**. Written disclosure statements, as set forth by Attachment 1 to this Chapter, are to be executed in duplicate, with a receipt acknowledgement signed and dated by the client, and maintained by the licensee for a period of five years. Licensees are subject to a random audit by the [NSBPA] or its designee for compliance with the written disclosure provisions of this rule.

**007.02E Disclosure Form for commission, contingent fee, or referral fee.**

(Emphasis supplied.) The rules do not anywhere define the term "commission."

The rules then set forth a disclosure form which "is required by the [NSBPA] for use by duly licensed Certified Public Accountants (CPA's) who intend to accept from any client compensation in the form of a commission, a contingent fee or a referral fee." The rules explain that "CPA's are prohibited from accepting a commission or contingent fee as compensation from a client for whom the CPA or the CPA's firm also performs" the specified financial services. Nothing prohibits offering a "commission." The evidence was uncontroverted that Bland did not accept a commission; it offered one to Dick.

Also, any wrong committed under the NSBPA rules was against the client and concerned an accountant's potential conflict of interest vis-a-vis a client's interests. And the commission structure at Bland that KPG takes issue with was not directed toward KPG; it was the bonus offered to all accountants for bringing in clients. The object sought was to reward accountants for networking efforts that resulted in expanding Bland's client base. It was not dependent upon whether the clients were previously being served by another accounting firm. Again, improper means depends upon the relation

between the actor and the person induced and upon the object sought to be accomplished by the actor.[158]

[60] As a matter of law, the excluded evidence would not have been sufficient for KPG to satisfy its burden of proving that the conduct did not fall within the competitor's privilege. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[159] We find that KPG was not unfairly prejudiced by the exclusions of expert opinion that Bland had violated the NSBPA rules.

### 6. Dick's and Bland's Cross-Appeals

Dick assigns on cross-appeal that the district court erred by denying his motion for a directed verdict against KPG on KPG's counterclaims, because KPG failed to present sufficient evidence for the trier of fact either to find damages with reasonable certainty or to find that any damages were proximately caused by Dick's wrongful conduct. Bland makes similar assignments of error in its cross-appeal regarding KPG's third-party claims against it. Because we find no merit to KPG's appeal and affirm the judgment for that reason, it is unnecessary to address the cross-claims presenting alternative grounds for affirming the judgment.

### VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.

Miller-Lerman, J., not participating.

---

[158] See, Restatement (Second) of Torts, *supra* note 153, comment on clause (a); Restatement of Torts, *supra* note 148, comment on clause (b).

[159] *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017).